519 F.2d 1112
 Kenneth W. "Tex" ATKINSON, Plaintiff-Appellee-Cross-Appellant,
v.
The EQUITABLE LIFE ASSURANCE SOCIETY OF the UNITED STATES,
Defendant-Appellant-Cross-Appellee.
 No. 74-3265.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 26, 1975.
 
 Robert P. Gaines, Pensacola, Fla., for defendant-appellant-cross-appellee.
 Roderic G. Magie, W. H. F. Wiltshire, Pensacola, Fla., for plaintiff-appellee-cross-appellant.
 Hal A. Davis, Quincy, Fla., for Fred Hodges, Jr.
 Appeals from the United States District Court for the Northern District of Florida.
 Before GODBOLD, Circuit Judge, SKELTON, Associate Judge* and GEE, Circuit Judge.
 GEE, Circuit Judge:
 
 
 1
 This Florida diversity case presents for review two disparate causes of action, breach of contract and slander, connected solely by identity of parties and by their source in a common employment relationship. Appellee Kenneth W. "Tex" Atkinson (Atkinson) brought suit on both causes and several others which succumbed to presently uncontested rulings by the court below against his former employer, The Equitable Life Assurance Society of the United States (Equitable). A jury trial produced findings favorable to Atkinson on liability and too-favorable on damages: the court thought the latter[1] so grossly excessive as to be insusceptible to correction by remittitur and granted retrial of all damages. A second trial, however, produced a verdict of like overall magnitude: in contract, $19,280; for the slander, $15,000 general damages and $125,000 punitive; or a total award of $159,280. This time the court gave judgment on the verdict. Equitable appeals, and we reverse and remand for further proceedings. The two causes being quite distinct, we treat each separately with a statement as to each of its essential facts.
 
 The Contract Claim
 
 2
 Atkinson's contract claim is for renewal commissions on premiums paid for policies sold by him during their fourth through tenth policy years. His contract with Equitable provided, with refinements unnecessary to detail, that such commissions became vested and thus discharge-proof upon completion of his fifteenth year of service as an agent. He was prevented from accomplishing that term of service by a discharge, without citation of cause, at thirteen and one-half years. It is Atkinson's contention, accepted by the trial court, that though his contract authorizes Equitable to discharge him without cause from his position as an agent, such a discharge cannot defeat the vesting of these renewal commissions at the conclusion of the fifteen-year term. The contention raises difficult problems, not so much of contract construction, as of the application of precedent in this Circuit. For it must be conceded that on conventional principles of contract construction, as well as on Florida law so far as it gives light, the contract empowers Equitable to terminate all benefits to Atkinson, with or without cause.
 
 
 3
 The contract is one for services, and of indefinite duration. It seems settled in Florida that such contracts, absent a specific provision to the contrary, are terminable at will and without notice by either party. Sher v. Shower Door Co., 197 So.2d 333 (Fla.App.1967). Atkinson's contract, moreover, contains provisions so clearly permitting termination by either party without cause on seven days' notice (P XII.B.), and by Equitable, for specified causes, without notice (P 12.A.)[2] that no construction short of redrafting could determine otherwise.
 
 
 4
 Nor can there be much doubt regarding the meaning of the contract's provisions about the effect of termination on renewal commissions. In the very section granting such commissions it is specified that ". . . no renewal commissions or service fees shall be allowable after termination of such agreement or service except as renewal commissions may be allowed pursuant to the vesting provisions on Page Six." And on page six, under the heading "Upon Termination of Agreement," it is provided: "When the agent has been continuously under written agreement to solicit for the Society (Equitable) or continuously in the service of the Society . . . for the respective periods of years . . . set forth in the following table . . . renewal commissions shall become vested in the agent to the extent stated in said table . . . ." That table specifies fifteen years service for accrual of the benefits which Atkinson claims in this action. It is undisputed that he was terminated a year and a half short of such a term of service, and though he argues that termination for cause should be read into the contract's renewal-commission and vesting provisions, the contract terms afford not even a foothold for doing so. It is thus apparent that if we are to arrive at the result for which he contends, it cannot be by means alone of any fair or even strict or strained construction of the contract's terms. Such a result would require resort to the congeries of equitable principles intended to prevent fraud, profit by one's own wrong and forfeitures. Nor is there want of persuasive, though not binding, precedent in this Circuit for such an approach to the problem.
 
 
 5
 The case by which the court below seems to have been principally guided in its treatment of the contract at issue is Coleman v. Greybar Electric Co., 195 F.2d 374 (5th Cir. 1952), a Texas diversity case decided by our court, in want of controlling Texas authority and on general reasoning, but since cited with favor by the Texas courts and several of our sister circuits.[3] Though not technically controlling in this Florida matter, or precisely in point on its facts, Coleman's general course of reasoning so clearly supports appellee as to require a careful consideration of it and of its factual similarities to and differences from our case.
 
 
 6
 In December 1947, Earl Coleman left a $300-per-month salary for a $200-per-month drawing account with Greybar Electric, plus a bonus based on his sales during the calendar year 1948, to be paid on April 1, 1949, if he then remained in Greybar's service. On February 15, 1949, forty-five days short of the payment date, he was discharged without stated cause. The employment agreement appears to have been oral, but the bonus plan to which it referred (with its April 1 requirement) was written, as was Coleman's employment application. This latter provided that "employment is at the discretion of the company and may be terminated at any time," and at trial Greybar's right to discharge Coleman from employment without cause was conceded. Coleman urged, however, as does Atkinson here, that if he were terminated without cause the bonus was due him for his accomplished work. Suffering a directed verdict, he contended on appeal that there was evidence in the record sufficient to warrant submission to the jury of the questions whether there was good cause for his discharge and whether Greybar's eleventh-hour firing was in bad faith. Greybar stood on its conceded legal right to terminate without cause, asserting that no recovery could be based on exercising of that conceded right, and contended as well that even were bad faith relevant there was no evidence of it.
 
 
 7
 Our court reversed and remanded for jury trial. It commenced its inquiry by noting the stated purpose of the written and integrated compensation plan to provide "an incentive to continuous service with the company" (i. e., not to quit) and the consistency with that purpose of the plan's further provision that to receive a bonus the employee must remain in service through "the first of April following the year for which the compensation hereunder is payable." We noted further that the plan's provision denying bonus if the employee "leaves or ceases to be in the employ of the company" before April 1 next following was likewise consistent with that purpose if such departure was voluntary or was occasioned by out-of-line behavior. But a construction which permitted depriving the employee of his earned bonus "without any cause and as a matter of arbitrary choice," at the employer's "own whim," or "because of a desire to evade the payment of additional compensation would be entirely inconsistent with the purpose of the plan and, in the absence of clear and compelling language, should not be adopted." 195 F.2d at 377. So reasoning, and with reference to general principles against forfeitures or placing one in a position to take advantage of his own wrong, we refused a construction of the arrangement between Coleman and Greybar by which "the language of the employment application which granted the employer the right to terminate . . . in its discretion . . . can be . . . imported into the language of the compensation plan" to permit forfeiture of the earned bonus. Ibid, passim.
 
 
 8
 We are in full agreement with the result of Coleman; and only a slight extension, if any, of its general course of reasoning would be necessary for it to control this case. Nor can any ready or broad-brush distinction of it be successfully essayed. However, in considering whether it should be imported into our notions of Florida law, a law at present unformed on this point, we note certain factual nuances between Coleman's and Atkinson's cases. In the first place, and most importantly, Coleman on its facts is weakest at the precise point for which it is here advanced: no-cause discharge. Though our opinion discusses the law applicable to that situation somewhat broadly, it seems unlikely that it was really invoked. To the contrary, the facts stated in our opinion indicate rather clearly the presence of a classic either/or situation: either Coleman was in fact discharged for cause,[4] or he was fired in bad faith.[5] We think it most unlikely that, on such competing evidence, Earl Coleman was, or a jury would find that he was, the subject of a colorless, no-cause discharge: all for all, one way or the other, seems to have been his case. Thus, the Coleman opinion is here put forward as ruling, in principle, the very fact situation which it almost surely did not present.[6]
 
 
 9
 Other distinctions, minor in severalty but not in gross, present themselves. We deal here with a standard, detailed, printed and integrated contract, which governed Atkinson's relationship, and presumably those of his brother agents, to his employer. We are not here free, as in Coleman, to transmit or not to transmit fragments from one writing across an oral conductor to another writing. Atkinson's discharge was not so eleventh-hour as to raise the hackles of equity as did Coleman's; Coleman was let go after less total service than remained to Atkinson for securing the benefits which he here claims.[7] And Atkinson, unlike Coleman, had more to do to earn his bonus than pass time in grade; in theory and doubtless to some degree in fact he had a year and a half to go of work at encouraging renewals before he crossed Jordan. Finally, in a legal key, we are in no sense technically bound to bring home to Florida jurisprudence any extension of the general reasoning underlying decision of a hard case on Texas law.
 
 
 10
 With deference to Coleman and some difficulty, we decline to do so. Parties freely contracting are entitled to cut their own bargains. Atkinson's with Equitable is, on normal principles of law and grammar, very clear. To alter it after the fact by mere construction would be to impute to it a meaning which cannot honestly be found in its language, language to which Atkinson at least assented. Instead, it would be necessary for us to employ equitable principles of relief which are inappropriate here and against, not in aid of, the contract's likely meaning to prevent outrageous behavior and unacceptable consequences. Such considerations would be brought into play by a fact-finding of a bad-faith discharge by Equitable or perhaps even of a causeless discharge under a contract of doubtful meaning, which may have justifiably misled Atkinson about his rights. Here there is neither.
 
 
 11
 Nor, as in Coleman's case, do we think a no-cause discharge is likely here. This record contains evidence of, as Atkinson's brief put it, "a petty personality conflict" between Atkinson and his immediate supervisor, who was, it was testified, out to "hang" him. It reveals, as well, activities by Atkinson shortly before and leading up to his discharge which may fairly be seen as casting his loyalty to Equitable and his compliance with their agreement in serious doubt. Evaluating these to ultimate conclusions is not our office, for it is plain that reasonable minds could differ in the matter. But there is evidence in this record which would justify a belief that, in derogation of his contract assumption of primary loyalty to Equitable, Atkinson had entered into general agency contracts with competing insurors and, in the period nearly preceding his discharge, had consulted their (and his) interests before those of Equitable and that Equitable was aware of these actions.[8] Though it should be obvious, we think it appropriate to state we remain, in these observations, well within our office and presume to find no facts: these are fairly disputed, and their resolution is not for us. But we do observe, as is our function, that they are fairly in issue. A proper factfinder must determine whether Atkinson's discharge was based in good cause, in no cause, or in bad faith.[9] When it has done so, we think it likely, as is so often the case, that the application of the law will not be difficult. The present judgment, based on none of such findings, cannot stand.
 
 The Slander Action
 
 12
 The evidence supporting Atkinson's slander action, together with authorities epitomizing Florida law on the question presented, are well stated in Atkinson's brief:
 
 
 13
 (A successor agent), acting as the representative of Equitable, visited Herbert Enfinger, a client of Atkinson's. (The agent) confused Enfinger about the details of a policy of insurance which had been sold to Enfinger by Atkinson. When Enfinger indicated that he wanted to talk to Atkinson because of the confusion generated by (the agent, he) made the following statements about Atkinson:
 
 
 14
 It is the man that sold it to you . . . he was selling for his own gain and not yours . . . he ain't looking out for you.
 
 Enfinger continued:
 
 15
 Well, he (the agent) informed me that his (Atkinson's) commissions was all that he was interested in, he (Atkinson) wasn't interested in my part of the policy. (A 363-365)
 
 
 16
 Equitable argues that these and other statements made about an insurance agent to his client do not constitute slander per se as a matter of law. The authorities relied upon by Equitable, however, do not support its position. There is no dispute about the law applicable to the defamatory statements made by (the successor agent).
 
 
 17
 In Campbell v. Jacksonville Kennel Club, 66 So.2d 495 (Fla.1953), the Supreme Court of Florida, adopting the Restatement view and the majority view of other jurisdictions held:
 
 
 18
 It is established in most jurisdictions that an oral communication is actionable per se that is, without a showing of special damages if it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office, or (d) the other being a woman, acts of unchastity. 66 So.2d 495, at 497
 
 
 19
 This principle of law expanding the categories of words considered as slanderous per se is the controlling law in this case. The history of the development of slander per se in Florida was recently summarized in Wolfson v. Kirk, 273 So.2d 774 (Fla.App. 4th 1973). The Defendant Kirk stated that when he was running a brokerage office he invited the plaintiff out of the office. That was all he said. The Court held that a complaint alleging those facts stated a cause of action for slander per se:
 
 
 20
 We conclude, however, that from the language of the comment, it does not seem unreasonable to infer that persons hearing the same and possessed of a common mind might have taken it to mean that the plaintiff was a person with whom commercial relations were undesirable. Given this meaning, the comment attributes to the plaintiff a characteristic which is incompatible with the conduct of any lawful business. Hence the comment could come within one of the categories of slander per se recognized in Campbell v. Jacksonville Kennel Club and Teare v. Local Union No. 295 (98 So.2d 79), supra. Of course the communication might also have been intended to convey and perhaps did convey only innocuous meanings. Where, however, a communication is ambiguous and is reasonably susceptible of a meaning which is defamatory, it is for the trier of fact to decide whether or not the communication was understood in the defamatory sense. Diplomat Electric, Inc. v. Westinghouse Electric Supply Co., 5 Cir. 1967, 378 F.2d 377. Wolfson v. Kirk, 273 So.2d at 778-779. (Emphasis original.)
 
 
 21
 For a full picture, there need only be added to the above that Enfinger, the sole source of testimony for Atkinson's slander case, gave no evidence that he repeated these assertions to anyone, and admitted that they had no effect to denigrate Atkinson in his estimation. Indeed, after taking the matter up with Atkinson and being reassured, he cashed in his Equitable policies despite Atkinson's advice to the contrary because he was unwilling to maintain any relationship with a concern related, however tenuously, to such assertions. For them the jury mulcted Equitable, in general damages, $15,000 (a figure not far from Atkinson's average annual earned commission income), and $125,000 punitive damages.
 
 
 22
 The disproportion of such damages as compensation, or as punishment, for the nasty gossip of a commission employee remarks not shown by any faintest evidence to have been authorized, tolerated, or even known of by Equitable requires no comment. It is intolerable that Tex Atkinson should be so blackguarded behind his back. It is equally so that he should receive $140,000 in compensation and salve for the single smear, made to one client and neither credited nor passed on. Attempting a remittitur from such a slash would amount to restoring a reasonable portion of the severed head. We decline to do so. Without relish, and recognizing fully that we are, in this function, not finders but "unfinders," we conclude that another attempt must be made, by another finder of fact, at a rational award. It sometimes happens that when one continues to receive unmeaning answers, the wrong question is being asked. It may be that the slander cause should be retried in whole, rather than merely as to damages, and the tardily-procured testimony of the successor agent heard. But this is for the trial court.
 
 
 23
 Reversed and remanded.
 
 GODBOLD, Circuit Judge (dissenting in part):
 
 24
 I would affirm the judgment on the breach of contract claim.
 
 
 25
 Under plaintiff's written employment contract with Equitable, substantial renewal commissions on business that he had written became "vested" after he worked for 15 years. Equitable fired him after 131/2 years, making the "vesting" impossible. What happens to the substantial renewal commissions on business previously written by the plaintiff (for the fourth through the tenth policy years)?
 
 
 26
 The trial judge concluded that Equitable would owe plaintiff the renewal commissions if it fired him in bad faith, and would not owe him if it fired him for "good cause." With respect to the intermediate situation a discharge for neutral reasons or "no cause" the trial judge, in this Florida diversity case, chose to follow the decision of this court in Coleman v. Graybar Electric Co., 195 F.2d 374 (CA5, 1952), a Texas diversity case. In Coleman this court, unable to find Texas authority and expressly basing its decision on general law (citing cases from several states and the Second Circuit), held that in the absence of language clearly contemplating and providing for such a result, a no-cause discharge did not result in a forfeiture of benefits. In the present case no one has been able to come up with precise Florida authority. In this situation I would give full deference to the experienced Florida trial judge's selection of Coleman as the governing law. If the majority are unwilling to accept his view of what the Florida law is and are unable to show by Florida precedent that he erred and indeed they are totally unable then at a minimum the case should be certified to the Supreme Court of Florida.
 
 
 27
 The methodology employed in this decision is antithetical to the operation of our federal system. In diversity cases we attempt to discern the state law. If we cannot, we certify the question to the courts of the state if certification is available, or, on the basis of state policies and the state decisions nearest to being on point, do the best we can at predicting what the supreme court of the state would hold. None of these was done here. Let us see what was done.
 
 
 28
 When an employee is discharged without cause he forfeits such benefits as commissions, bonuses, stock options and profit sharing if his contract clearly and specifically provides that they are forfeited. At least two general lines of authority have developed for the situation where there is a no-cause discharge and the contract does not provide for forfeiture. 81 A.L.R.2d 1078-82. Coleman, representing one line of authority, holds that the discharge without cause does not forfeit benefits unless the contract of employment contains express language "clearly contemplating and providing for such a result."[1] The opposing view is that benefits not distributed before the discharge are forfeited. The majority do not purport to have discovered that the latter line of authority is a part of Florida jurisprudence. Nor do they, after analysis, predict that the Florida Supreme Court, if faced with the issue, would adopt such a rule. The discussion contains one Florida citation, and it only relates to the employment contract's being terminable at will. Rather the opinion strains on factual grounds to escape Coleman, and, with that effort completed, assumes that the "forfeit everything" rule fills the vacuum and is the law of Florida. Of course, as the majority say, we are not "technically bound to bring (Coleman) home to Florida jurisprudence." Nor are we "technically bound" to do what has been done, which is "to bring home to Florida jurisprudence" the rule of forfeiture as a matter of law. What we are bound to do is to determine in the best way possible what the Florida law is or would be, on a reasoned basis and not on the likes of federal judges for one rule or another.
 
 
 29
 While I am greatly concerned at the erroneous methodology used in this case, I do not want to be misunderstood about my likes. I think Coleman expresses the better rule.[2] Therefore, I turn to the merits of the march around Coleman. It would have been at least more direct for the majority to say that they simply do not like the decision. The major theme of their opinion is that Coleman really did not involve a "no-cause" discharge. But the trial court in Coleman directed a verdict on the basis that there was no proof of the employer's bad faith, and we reversed and sent the case back for trial because:
 
 
 30
 We can not say that, considering the testimony in the light most favorable to the plaintiff in testing its sufficiency to withstand the motion for a directed verdict, the jury would not have been authorized to find that no cause for the discharge was shown. (Emphasis added.)
 
 
 31
 195 F.2d at 379. Judge Russell, writing for this court, spent most of page 377 analyzing the compensation plan and the related employment application to find if there was express language governing a discharge "without any cause." Finding no such language, he concluded that the case must be remanded for a jury to decide whether the discharge was without cause. That judgment cannot be rewritten 25 years later by the speculations in the present majority opinion that it was "unlikely" that on remand of Coleman the jury would find a no-cause discharge, and that "almost surely" the case did not present a no-cause discharge.
 
 
 32
 As I understand it, there is a second thesis (in the discussion following footnote 2 and again after footnote 7): that possibly the language of the present contract, by its own terms, may provide for a forfeiture. I do not so read the contract. But if the language is clear, certain and unambiguous, this court does not have the task of discerning the Florida law governing a situation where the language is not sufficiently clear, and, in that event, Coleman has nothing to do with this case and the effort to establish as the law of Florida a rule converse to that of Coleman is all beside the point.
 
 
 33
 Other distinctions, acknowledged to be minor, are no better. Obviously, whether the contract was oral (as in Coleman) or written (as here) makes not a particle of difference. The suggestion is made that Coleman is inapplicable because there the discharge was "eleventh hour." Coleman had worked approximately 90% of the period of employment required for vesting approximately 141/2 months of 16 months. The present plaintiff had worked 131/2 years of 15 years, or 90% of the period. If there is a distinction between 90%'s, I would think the law would protect the person who, like plaintiff, has lost part of the fruits of many years of work. In any event, the problem is not how long before the period will be completed but how much of the period plaintiff has already worked. As Professor Corbin points out, "substantial service" by the employee is what gives mutuality of obligation to a situation in which the employee has made no promise to continue working. Corbin, Contracts, § 153.[3]
 
 
 34
 Finally, the majority speculate that on remand of this case the jury is not likely to find a "no-cause discharge." Appellate fly-specking of a factual issue remanded for jury trial has no relation to discerning principles of Florida law.
 
 
 35
 Thus, in keeping with our usual deference to the views of district judges concerning the laws of their own states, I would affirm on the contract claim. As a second choice, I would certify the matter to the Florida Supreme Court to permit it to establish a rule for its state. I dissent to the majority's unwillingness to follow either course.
 
 
 36
 I agree with the disposition of the slander action.
 
 
 
 *
 Of the U. S. Court of Claims, sitting by designation
 
 
 [1]
 On the contract action, $18,000; on the slander action, $119,000 general damages and $42,000 punitive: grand total, $179,000
 
 
 [2]
 XII. Termination. A. This agreement shall be forthwith terminable if the agent shall enter under contract with or into the service of any other life insurance company or if the agent shall fail to comply with any of the provisions or conditions of this agreement, or if the agent shall violate any law in force in the territory in which the agent is doing business
 B. Unless otherwise terminated, this agreement may be terminated by either party by a notice in writing delivered personally, or mailed to the other party at the last known address, at least seven days before the date therein fixed for such termination.
 
 
 [3]
 E. g., Miller v. Riata Cadillac Co., 517 S.W.2d 773 (Tex.1974); Lemmon v. Cedar Point, Inc., 406 F.2d 94 (6th Cir. 1969)
 
 
 [4]
 Coleman admitted he did not conform to company rules, that he was repeatedly told to improve or lose his job, and finally that "the next time he did something wrong, he was going to get fired." 195 F.2d, at 378
 
 
 [5]
 There was testimony that he was successful at his job, had won several sales contests, was to be recommended for employment by Greybar's sales manager to one of its customers, and was given a good character and efficiency rating by one customer. In addition, his five-minutes-to-midnight discharge itself excites curiosity, at the least
 
 
 [6]
 And which, as will shortly be apparent, our case does not likely present either
 
 
 [7]
 The fifteen-year length of Atkinson's required service for full vesting causes anomaly in an uncritical application of Coleman's rule to it. For if we are to consider a causeless discharge at 131/2 years of service to permit vesting at 15 years, there is no stopping place in principle short of a holding that a causeless discharge after one year's service or one month's would have like effect. Such considerations tend to limit Coleman to situations like it, where an eleventh-hour discharge raises suspicion of bad faith
 
 
 [8]
 Not all of this went to the jury. The trial judge excluded evidence about Atkinson's operations acquired by Equitable after it dismissed him on reasoning that:
 Equitable, having the contract right to terminate, could not elect to terminate with cause if it did not then know the cause. For, absent such knowledge on its part, the existing cause could not have been the reason for the termination, nor that which brought about the termination. Absent knowledge by it at time of termination of cause for termination, its action in terminating was arbitrary.
 It is accordingly concluded that, at the trial of this case, Equitable may not present evidence of cause or causes for termination not known to it and not relied upon by it as cause for the termination.
 The record here indicates that Equitable had some grounds for its conclusion that Atkinson was diverting business to its competitors at the time it dismissed him: knowledge and copies of general agency contracts executed by him with competing insurors plus an unaccountably falling production by Atkinson. We do not understand Atkinson's contention to be that Equitable's action in dismissing him was arbitrary or taken in bad faith because based on insufficient evidence that he was diverting business. Rather, it seems to be that he was not in fact diverting business at all, within the meaning of his contract, or at any rate was doing nothing but what many other agents were doing with Equitable's at least tacit acquiescence.
 Although we cannot, of course, foresee in any detail what turns of circumstance or tactics may occur on another trial, in view of our remand we offer the following for such guidance as it may be. It is self-evident, as the district court observed, that ultimate facts or conclusions which never occurred to an actor at the time of his action may not be motives for it or be taken into account in evaluating its quality. But this is not the same as to say that where a conclusion actually drawn is attacked as incorrect on its merits, only evidence known to the concluder at the time he drew the conclusion may be considered in determining its objective truth. Moreover, if on retrial Atkinson undertakes to show that the true state of facts at the time of his discharge exonerates him, then Equitable is entitled to advance its own proof of what that state was, whenever acquired.
 
 
 [9]
 In this connection, employment of Rule 49 procedures may be desirable
 
 
 [1]
 See also: Corbin, Contracts, § 153, discussing the principle that the offer of an employer to pay bonus, pension, etc., to an employee who continues to serve for a stated period becomes irrevocable by the employee's rendering substantial service, which services give mutuality to the arrangement
 
 
 [2]
 Coleman is a pragmatic approach to a question of intention of the parties. It recognizes in a common sense way that absent specific agreement an employee who performs services as the quid pro quo for future payment of bonuses, commissions, profit sharing, etc., would not intend that at any time before the benefits are formally "vested" or paid, his employer can fire him at its whim and by its own act enrich itself at his expense. Arguably, the question of what was intended is for the jury and not the court, and perhaps Florida might wish to have that rule. But I see nothing to recommend the rule that as a matter of law the employee loses his benefits
 It is worth noting that the Coleman principle now appears to be firmly enshrined in the jurisprudence of Texas. Miller v. Riata Cadillac Co., 517 S.W.2d 773 (Tex.1974); Haggar Co. v. Rutkiewicz, 405 S.W.2d 462 (Tex.Civ.App.1966); Fujimoto v. Rio Grande Pickle Company, 414 F.2d 648 (CA5, 1969).
 
 
 [3]
 In following and applying Coleman in a bonus case, Texas provides for pro rata damages, that is, a percentage of the bonus equal to the percentage of the bonus period that the employee worked before termination. Miller v. Riata Cadillac Co., 517 S.W.2d 773 (Tex.1974). In a percentage-of-profits case decided under Texas law, this court held that the employee was entitled to the agreed percentage on profits earned up to the date of termination. Fujimoto v. Rio Grande Pickle Company, 414 F.2d 648 (CA5, 1969)