Guy D. RANDOLPH, Jr., and the Randolph Company, Plaintiffs-Appellants,

v.

NEW ENGLAND MUTUAL LIFE INSURANCE COMPANY, Defendant-Appellee.

No. 74–1727.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 5, 1974.

Decided Dec. 9, 1975.

Robert T. Keeler, Taft, Stettinius & Hollister, R. Joseph Parker, Cincinnati, Ohio, for plaintiffs-appellants.

William L. Blum, Dinsmore, Shohl, Coates & Dupree, Thomas J. Sherman, Cincinnati, Ohio, for defendant-appellee.

Before PECK and ENGEL, Circuit Judges, and O'SULLIVAN,* Senior Circuit Judge.

JOHN W. PECK, Circuit Judge.

This action, primarily for breach of contract, has its origins in a long-time contractual association between the individual plaintiff-appellant (usually hereinafter referred to as "Randolph"), and his father before him, with the defendant-appellee insurance company (usually hereinafter "NEL"). The corporate plaintiff-appellant is solely owned by Randolph and possesses no separate interests here in issue, and as in the proceedings in the district court and in the briefs and arguments in this court, the singular "plaintiff-appellant" will be used to designate Randolph and the corporate plaintiff-appellant.

The relationship between Randolph's father and NEL goes back to 1928 and thereafter the father, then father and son, and finally the son alone represented NEL as its General Agents for its "Cincinnati Agency," consisting of twelve counties in Southwestern Ohio and two in Northern Kentucky. Randolph began his insurance career as an agent in his father's office in 1947, and in 1953 father and son were appointed Co-General Agents for NEL in the area indicated for a term ending April 1, 1964. However, a year prior to that date Randolph's father elected to retire, and on May 9, 1963, Randolph was appointed sole General Agent. The General Agent's contract executed at that time was replaced by a successor General Agent's contract executed April 27, 1966, which was to terminate automatically on April 1, 1989.

The Amended Complaint, filed February 16, 1970, charged, in essence, that NEL breached the General Agency Contract by terminating it in 1969 "without cause and in bad faith" prior to its April 1, 1989, termination date, thereby damaging Randolph and unjustly enriching itself. Count 1 alleges that such termination wrongfully deprived Randolph of the net income from his agency business at an average rate, which could be reasonably anticipated at $30,000 a year for the remaining nineteen and one-half years of the contract, or $585,000. Count 2, an alternative count, alleges unjust enrichment by NEL in the amount of $40,000 a year for the remaining term of the contract by depriving Randolph of his collection fees and insurance-in-force allowances. Count 3 seeks to recover $390,000 in "vested overriding commissions" which would have been payable after the term of the contract.[1] Count 4 seeks to recover lost "nonvested commissions" and service fees on renewal premiums attributed to Randolph's personal production as an agent in the amount of $74,317. Count 5 is an alternative to Count 4 based on the theory of unjust enrichment. Count 6 seeks to recover fees in the amount of $350,000 which Randolph Company would have earned by servicing and advising various pension and benefit plans funded through insurance policies written by NEL and sold by Randolph.

Following a protracted series of discovery procedures which produced a mass of exhibits and depositions, NEL filed a motion for summary judgment. For reasons which are not entirely clear (due in part to the fact that the referral was made under a general order of reference which is not before us), the case was referred to the United States Magistrate as a Special Master, even though the issues presented were purely questions of law. In the circumstances this reference was unfortunate at least because following its adoption of the Master's findings of fact and conclusions of

---

* Honorable Clifford O'Sullivan died on October 7, 1975, and did not participate in this decision.

1. Though Randolph prays for $540,000 in "vested overriding commissions," he admits that $150,000 in such commissions are payable even with the termination. Thus, his damages, if the termination were wrongful and assuming his "figures" were correct, would be $390,000.

law, it put the district court on the defensive, as indicated by this explanation in its opinion and order.

"The plaintiffs filed objections in which the Court was urged not only to reject the Magistrate's report but to consider the matter anew, arguing that the matter was not an appropriate one for reference to a Magistrate. We recognized that the argument against the reference of a motion for summary judgment to a Magistrate as a Master was earnestly made and not without support. To avoid any question the Court granted the plaintiff's request for oral argument and considered the motion independently on the extensive briefs pro and con, as well as the oral arguments."

Whether or not the reference was ill-advised, compare *Ingram v. Richardson,* 471 F.2d 1268 (6th Cir. 1972), with *Yascavage v. Weinberger,* 379 F.Supp. 1297 (M.D.Pa.1974), we accept this statement by the district judge at face value and attach no further significance to the issue raised in this regard by plaintiff-appellant.

The fruits of the discovery procedures earlier referred to exhaustively chronicle the long and amicable relationship between the Randolphs and NEL, and include many laudatory statements made by its high officials concerning the Randolph agency's diligence, initiative and effectiveness.

This long period of amiability ended July 15, 1969, abruptly or otherwise; just how abrupt and unforeseen this occurrence was depends upon which party's evidence is credited, but this is an issue which need not be reached here. Be that as it may, an NEL vice-president, by letter of that date, advised Randolph that "we feel we have no alternative but to make a change in the management of our Cincinnati Agency now," and after some further correspondence another NEL vice-president, by letter dated September 5, 1969, exercised NEL's "right . . . to terminate the agency upon giving sixty days' notice in writing," the termination being effective November 4, 1969.

The sole legal issue which requires resolution is whether the contract executed April 27, 1966, was terminable by unilateral action of either party prior to its April 1, 1989, termination date, which in turn requires an interpretation of Section 15 of that Agreement. That section reads,

"The Agency shall terminate automatically on the Normal Retirement Date or on the prior death of the General Agent, but except as provided in Section 14 *each of the parties hereto shall have the right to terminate the Agency at any prior time upon giving sixty days' notice in writing.*" (Emphasis supplied.)

On the ground that Section 15 authorized the termination effective November 4, 1969, the district court granted NEL's motion for summary judgment, and this appeal followed. We reverse and remand.

■ The district judge applied Ohio law in this diversity case, and the parties have acquiesced in such application. In the absence of "reported [state] decision[s] on the precise issue involved," this court, like other courts in the absence of "controlling state precedent," gives "considerable weight" to the district judge's interpretation of state law. *Filley v. Kickoff Publishing Co.,* 454 F.2d 1288, 1291 (6th Cir. 1972); accord, e. g., *Carson v. National Bank of Commerce Trust & Savings,* 501 F.2d 1082 (8th Cir. 1974) ("great weight"), *Buehler Corp. v. Home Ins. Co.,* 495 F.2d 1211, 1214 (7th Cir. 1974) ("great weight"), *Luke v. American Family Mut. Ins. Co.,* 476 F.2d 1015, 1019–20 (8th Cir. 1972), cert. denied, 414 U.S. 856, 94 S.Ct. 158, 38 L.Ed.2d 105 (1973) ("special weight"). Yet appellants "are entitled to review of the trial court's determination of state law just as they are of any other legal question." *Buehler, supra;* accord, *Luke, supra.*

Neither party has cited an Ohio case directly in point, that is, implying or refusing to imply "good faith" or "cause"

limitations on a facially unrestricted termination provision in a contract otherwise for definite duration. Likewise, no Ohio statute appears to be controlling. See Ohio Rev.Code § 1333.72 (Supp.1974) (imposing a duty of acting in good faith for motor vehicle manufacturers' terminating or cancelling a franchise "[n]otwithstanding the terms, provisions, or conditions of any agreement or franchise"); Ohio Rev.Code § 1301.09 (1962) (imposing an obligation of good faith in contracts within the Uniform Commercial Code).

Though Randolph repeatedly asserts that a termination clause, like Section 15, in a contract otherwise for definite duration, permits termination only "for cause," such termination clauses in contracts otherwise for definite duration have been construed to permit termination "with" or "without" cause.

> "The improbability that an agent would knowingly enter into such a contract revocable at the will of the company, is not so great as the improbability that the company would knowingly tie itself to an agent by a bond that, for 10 years, it could not break, unless by legal evidence it could prove that there was misconduct serious enough for a jury to consider to be 'good cause.'" *Jefferson Fire Ins. Co. v. Bierce & Sage*, 183 F. 588, 592 (E.D. Mich.1910).

See *Kuffel v. Seaside Oil Co.*, 11 Cal. App.3d 354, 90 Cal.Rptr. 209 (1970) (dictum); *Batchelor's Building Maintenance Serv., Inc. v. Douglas Avenue Corp.*, 205 Kan. 149, 468 P.2d 189 (1970); *Ventanas Del Caribe v. Stanley Works*, 158 Conn. 131, 256 A.2d 228 (1969) (Florida law). While neither party has nor have we

found an Ohio case reconciling a termination clause, like Section 15, with a definite duration provision, Ohio courts, at least in the absence of a definite duration provision, have refused to limit such termination clauses to "good cause" terminations. *Columbus Metropolitan Housing Auth. v. Simpson*, 85 Ohio App. 73, 85 N.E.2d 560 (1949); see *Parks v. Baldwin Piano & Organ Co.*, 262 F.Supp. 515 (D.Conn.), aff'd, 386 F.2d 828 (2d Cir. 1967) (applying Ohio law); *Green Bay Auto Distributors, Inc. v. Willys Overland Motors, Inc.*, 102 F.Supp. 151 (N.D. Ohio 1951); *Gillette v. Brookhart*, 70 Ohio L.Abst. 493, 123 N.E.2d 693 (1954).

We are particularly unwilling to limit Section 15 to "cause" terminations since Section 14 authorizes certain "cause" terminations without notice but with forfeiture of any "commissions and other rights accruing" under the April 27, 1966, contract if Randolph (1) withheld or converted NEL monies, (2) subjected NEL to liability by violating the contract conditions, or (3) acted as a general agent fraudulently or unlawfully.[2] See *Atkinson v. Equitable Life Assurance Society*, 519 F.2d 1112, 1114 (5th Cir. 1975).

[2] Although we hold that Section 15 authorizes termination "without cause," we conclude that Section 15 would not permit either party to terminate in "bad faith." Even with no definite duration provision, what we regard as the better reasoned line of cases has imposed a duty of good faith on the exercise of a facially unrestricted termination clause. E. g., *deTreville v. Overboard Marine Corp.*, 439 F.2d 1099, 1100 (4th Cir. 1971) (South Carolina law) (cannot terminate

---

**2.** "FORFEITURE OF CONTRACT

"It is expressly agreed between the parties hereto that if the General Agent shall withhold or convert to his own use, or for the benefit of others, any money, or other property of the Company, or otherwise subject the Company to liability by violating any of the conditions of this Contract, or if he shall act in a fraudulent or unlawful manner as such General Agent, this Contract and any commissions and other

rights accruing hereunder to the General Agent, his executors or administrators, shall become forfeited and void, and the Agency shall at once become terminated without notice, and the General Agent, his executors or administrators, shall be liable to the Company for all losses which may result from any such violation."

"contrary to equity and good conscience"); *Rees v. Bank Bldg. & Equipment Corp.*, 332 F.2d 548 (7th Cir.) (Missouri law), *cert. denied*, 379 U.S. 932, 85 S.Ct. 332, 13 L.Ed.2d 344 (1964); *Zimmer v. Wells Management Corp.*, 348 F.Supp. 540 (S.D.N.Y.1972); see *Atkinson v. Equitable Life Assurance Society*, 519 F.2d 1112 (5th Cir. 1975). Contra, *Bushwick-Decatur Motors, Inc. v. Ford Motor Co.*, 116 F.2d 675 (2d Cir. 1940); *Rubinger v. IT&T*, 193 F.Supp. 711 (S.D.N.Y.1961). Moreover, an Ohio appeals court has recognized such line of cases as "hold[ing] that, where a principal has the right to terminate the authority of an agent at any time, such principal may not do so in bad faith and as a device to escape the payment of a broker's commission." *Smith v. Frank R. Schoener, Inc.*, 94 Ohio App. 308, 311–12, 115 N.E.2d 25, 27 (1953). Admittedly, *Green Bay Auto, supra,* applying Ohio law, refused to imply a "good faith" limitation into the termination clause of an exclusive distributor sales agreement, but *Green Bay* distinguished *J. R. Watkins Co. v. Rich*, 254 Mich. 82, 235 N.W. 845, 846 (1931) ("A provision in a contract for termination at the option of a party is valid. But . . . the option may be exercised only in good faith."), as involving a contract, like Randolph's, "for a fixed period." More importantly, *Jefferson Fire, supra*, scrutinized a termination notice, given pursuant to a facially unrestricted termination clause in a fixed duration contract, for evidence of bad faith.

> "I have not considered the evidence of the sayings or doings of the parties, *except far enough to be assured that the company* was, in fact, dissatisfied with the agency, and *did not give defendant notice in bad faith* or fraudulently." *Jefferson Fire, supra*, 183 F. at 592. (Emphasis supplied.)

Even in the absence of a provision for definite duration, an Ohio court has carefully noted the absence of an allegation of bad faith in termination. *Gillette, supra*, 123 N.E.2d at 699. The appeals court in *Harding v. Montgomery Ward Co.*, 41 Ohio L.Abst. 243, 247, 58 N.E.2d 75, 77 (1944), similarly noted the absence of evidence that "the defendant discharged [plaintiff] for the purposes of cheating and defrauding him of the amount of bonus that would have been payable to him had he served the complete fiscal year." It seems apparent that Ohio courts would require a resolution of the issue created by an allegation of bad faith (in the absence of an express provision permitting termination in bad faith), in an action concerning an agency contract with the principal and the agent owing each other reciprocal duties of good faith. *Ross, supra*, 332 F.2d at 551–52.

We find no prejudicial error in the district court's dismissal of the two counts claiming unjust enrichment or quasi-contract. Ohio permits no recovery on such theories where, as here, an "express contract cover[s] the same subject," *Williams v. Goodyear Aircraft Corp.*, 84 Ohio App. 113, 85 N.E.2d 601, 604 (1948), *accord, Wright v. Southwestern Life Ins. Co.* 364 F.Supp. 981, 986 (W.D.La.1972), at least in the absence of "bad faith." *Ullmann v. May*, 147 Ohio St. 468, 72 N.E.2d 63 (1947). Though *Ullmann* is unclear whether the "bad faith" must be in inducing the party into entering the contract, or only in terminating the contract, Randolph's unjust enrichment, or quasi-contract, theories are no broader than his contract theory, both requiring proof of "bad faith." The contract theory then being just as "adequate" as the unjust enrichment, or quasi-contract, theories, founded in equitable principles, *Paramount Film Distributing Corp.*, 86 Ohio L.Abst. 225, 176 N.E.2d 610, 621 (1960), *aff'd*, 175 Ohio St. 55, 191 N.E.2d 839 (1963), the unjust enrichment, or quasi-contract, theories are unavailable, *Hoover v. Hoover*, La.App., 313 So.2d 358 (1975), particularly in light of plaintiff-appellant's failure to present those theories on appeal.

For the reasons hereinabove stated, the granting of the motion for summary judgment was improper. Reversed and remanded for further proceedings not inconsistent herewith.