780 F.2d 1021
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
(The decision of the Court is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter.)
GENERAL MOTORS CORPORATION, Plaintiff-Appellee,
v.
THE MAHONING VALLEY SANITARY DISTRICT, Defendant-Appellant.
 84-3638
 United States Court of Appeals, Sixth Circuit.
 11/19/85
 
 REVERSED AND REMANDED
 N.D.Ohio
 On Appeal From the United States District Court for the Northern District of Ohio
 Before: LIVELY, Chief Judge; ENGEL, Circuit Judge; and COHN, District Judge.*
 ENGEL, Circuit Judge.
 
 
 1
 Although variously framed by the parties, the single issue presented in this Ohio diversity case is whether the district court erred in its finding that a sanitary district, which had entered into an oil and gas lease with General Motors Corp., could only exercise its right to refuse future drilling in good faith.
 
 
 2
 The Mahoning Valley Sanitary District is a political subdivision of the State of Ohio and a public corporation formed under Ohio Rev. Code Ann. Sec. 6115 (Baldwin 1981) for the sole purpose of providing a public water supply for the member cities of Youngstown and Niles, Ohio. The Sanitary District owns and controls approximately 5,500 acres of forested land which contains the reservoir that supplies the Sanitary District's water. On July 20, 1972, the Sanitary District entered into an oil and gas lease with Pennslyvania Industrial Corporation (Penn. Industrial), an affiliate of Atlas Resources, Inc. (Atlas), as lessee, covering all 5,500 acres of the Sanitary District's property. On August 1, 1973, Atlas and Penn. Industrial executed an agreement with GM wherein GM was given an option to purchase the oil and gas lease. GM later exercised the option and purchased the lease in July, 1976.
 
 
 3
 Pursuant to the lease, one well was drilled on the Sanitary District's property in February, 1973. During 1977, GM proposed to drill a second well. Although GM asserted that the Sanitary District's Board of Directors approved the second drilling, the Sanitary District denied that such approval was given. Subsequently, in a formal resolution adopted on January 5, 1983, the Sanitary District refused all future drilling.
 
 
 4
 On March 31, 1983, GM filed suit for declaratory and injunctive relief. In its complaint, GM alleged that it had the right to drill additional oil and gas wells upon the leased premises, subject only to the right of the Sanitary District to approve well sites. GM also asserted that the Sanitary District approved the drilling and location of a second well. The district's answer denied that it had approved a second well, and asserted that a condition precedent to any further drilling under the lease was approval by the Sanitary District. Specifically, the parties disagreed as to the proper interpretation of the 'future drilling' clause of the lease which provides:
 
 
 5
 Lessee also agrees that after the first well is drilled, tested and studyed [sic], that the Lessor will have the right to agree or disagree on any other drilling operations on the above described property. If Lessor agrees on further drilling operations, all locations of drilling and pipe lines will be OKed by Lessor.
 
 
 6
 The district court found that the future drilling clause was ambiguous. 'The ambiguity lies in whether the future drilling clause provides that [the Sanitary District's] approval is required before each well is drilled, or whether [the Sanitary District's] approval is required only prior to the drilling of the second well with merely site approval retained by [the Sanitary District] for any well drilled thereafter.' General Motors Corp. v. Mahoning Valley Sanitary District, No. C83-1403-Y, slip op. at 10 (N.D. Ohio June 28, 1984). The court considered parol evidence and concluded that approval by the Sanitary District was required before the drilling of each well, and found that such approval for the well was not given. These findings have not been appealed by GM.
 
 
 7
 The district court went on to hold that the Sanitary District's right to approve new drilling must be exercised in good faith. First, the district court held that in every contract there is a duty of good faith, fair dealing and cooperation between the parties. Second, the district court concluded that good faith was implied by the parties since without good faith, the contract would be rendered a nullity. The court then found that the Sanitary District's refusal to permit further drilling was arbitrary, and enjoined the Sanitary District from withholding approval of the second well 'on the basis of reasons given to date.' The Sanitary District appeals from the court's judgment.
 
 
 8
 On appeal, the Sanitary District raises four issues based upon the Ohio law of contracts. First, the Sanitary District asserts that the lower court erred in not giving the future drilling clause its plain and unambiguous meaning. Second, the Sanitary District asserts that Ohio does not recognize in every contract an implied covenant of good faith. Third, even if Ohio recognizes an implied covenant of good faith, the Sanitary District asserts that the covenant cannot vary the express language of the lease. Finally, the Sanitary District asserts that even if such a covenant of good faith was implied in the lease, it did not breach the covenant. We agree with the first, third and fourth assertions and accordingly reverse.
 
 DISCUSSION
 I.
 
 9
 Under Ohio law, 'The rights and remedies of the parties to an oil or gas lease must be determined by the terms of the written instrument. . . . Such leases are contracts, and the terms of the contract with the law applicable to such terms must govern the rights and remedies of the parties.' Lake v. Ohio Fuel Gas Co., 2 Ohio App.2d 227, 207 N.E.2d 659, 662 (1965), quoting Harris v. Ohio Oil Co., 57 Ohio St. 118, 48 N.E. 502, 506 (1897). Construction of written contracts is a matter of law. Alexander v. Buckeye Pipe Line Co., 53 Ohio St.2d 241, 374 N.E.2d 146, 148 Syllabus 1 (1978). Contracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language. Skivolocki v. East Ohio Gas Co., 38 Ohio St.2d 244, 313 N.E.2d 374, 375 Syllabus 1 (1974).
 
 
 10
 A. Ambiguity in Future Drilling Clause.
 
 
 11
 The Sanitary District asserts that the district court erred in not giving the future drilling clause its plain and unambiguous meaning. The clause states that the Sanitary District 'will have the right to agree or disagree on any other drilling operations on the above described property.' The ordinary meaning of these words and the intent of the parties according to the Sanitary District is that the Sanitary District may elect whether to allow future drilling. Although the district court found the future drilling clause to be ambiguous in whether approval was required each time or only once, (and resolved this in favor of the district), it did not specifically find this language of the lease to be ambiguous in its requirement that approval was in fact required. Instead, the district court found that good faith was implied by the parties since without good faith, the contract would be a nullity.
 
 
 12
 In its brief on appeal, GM asserts that the above language is ambiguous as to whether good faith is required in the Sanitary District's decision not to allow future drilling. Ohio law recognizes that clear and unambiguous language of an instrument may not be varied by extrinsic evidence. The Supreme Court of Ohio has stated in the syllabus[1] of Blosser v. Enderlin, 113 Ohio St. 121, 148 N.E. 393, 393 Syllabus 2 (1925), that
 
 
 13
 Except where the reformation of a written contract is sought in equity, evidence cannot be introduced to show an agreement between the parties materially different from that expressed by clear and unambiguous language of the instrument.
 
 
 14
 Even if we look to extrinsic evidence to help clarify any ambiguity, the evidence in the record shows that the intent of the parties was that the Sanitary District would have complete control over the decision to allow future drilling. Mr. R. Clare Westinfield, former board member of the Sanitary District, testified as to the meaning of the future drilling clause:
 
 
 15
 Q. Was there any intent on your part to see to it that the Sanitary District retained control over future drilling?
 
 
 16
 A. That was a requirement. That was most definite.
 
 
 17
 .............................................................
 
 
 18
 ...................
 
 
 19
 * * *
 
 
 20
 Q. When you say you wanted to retain control, what do you mean?
 
 
 21
 A. We wanted to determine whether there would ever be more than one, the one well that this lease allowed or whether there wouldn't be, and if so, where it or any other well or wells would ever be.
 
 
 22
 Q. If there were four wells drilled, did you feel that it was going to be the right of the Sanitary District to stop further drilling if it chose?
 
 
 23
 .............................................................
 
 
 24
 ...................
 
 
 25
 * * *
 
 
 26
 A. It was our intent that we could determine whether there would be a second one; and if there was a second one allowed, whether there would be a third one; and if there was a third one allowed, whether there would be a fourth or any more, whatever.
 
 
 27
 Trial transcript at 395-97.
 
 
 28
 Q. With respect to the last typed paragraph in the lease, was the reason that you wanted that clause in the lease was to protect against environmental damage as a result of drilling?
 
 
 29
 A. Yes. In many different ways, environmental damage, including the water supply, our duty to the 300,000 people, everything.
 
 
 30
 Q. Other than those environmental concerns, were there any other reasons why you wanted that language in there?
 
 
 31
 A. Environmental reasons are very broad, but I would say that as the responsible people for protecting the District and its water supply, we were determined that we had to control it.
 
 
 32
 Id., at 408-09. Mr. Donald D. Heffelfinger, former secretary and chief engineer of the Sanitary District, testified as to his understanding of what the clause meant.
 
 
 33
 THE WITNESS: My understanding was that this was strictly to be done on a well-by-well basis. That was the protection that the District would have so that if at any time during drilling of any well pollution occurred or a possibility of pollution would occur, that they would have the right to refuse any further drilling.
 
 
 34
 Jt. App. at 81; Deposition transcript at 33.
 
 
 35
 .............................................................
 
 
 36
 ...................
 
 
 37
 * * *
 
 
 38
 [Question] Is it your understanding from your discussions with the board before the lease was entered into, as to what they understood the lease to provide in terms of the rights of the District? Did you understand that the District could walk away from this lease at any time and deny future drilling for absolutely no reason?
 
 
 39
 .............................................................
 
 
 40
 ...................
 
 
 41
 * * *
 
 
 42
 THE WITNESS: I don't think that was ever discussed. I can give no opinion of that, because, after all, we were entering into an agreement with a company which had certain requirements and we had certain requirements, and there was no consideration of walking away. However, as I say, the District felt that they wanted complete control so that they could stop at any time. Now, for what reason, that was never discussed.
 
 
 43
 Q BY MR. RIDGLEY: Wasn't it discussed that the only reason that you wanted this complete control was to assure the water supply safety?
 
 
 44
 A That's correct.
 
 
 45
 Jt. App. at 82; Deposition transcript at 38. In view of the foregoing, it appears to us that to the extent it was permissible to go outside the plain writing of the lease, the proof overwhelmingly showed that the intent of the parties was that the Sanitary District would retain control over the decision to allow further drilling. Any finding to the contrary must be deemed clearly erroneous.
 
 
 46
 In Alexander v. Buckeye Pipe Line Co., supra, 53 Ohio St.2d 241, 374 N.E.2d 146, 148 (1978), the Supreme Court of Ohio faced the issue of how to construe the terms 'oil,' 'gas,' and 'alongside of' in an agreement granting a right of way to lay oil and gas pipelines. The court held in its syllabus:
 
 
 47
 2. Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument.
 
 
 48
 We are obliged to hold that to the extent the lease agreement in question might be held to have been ambiguous as to its intent, the overwhelming evidence showed an intention on the part of the parties that exclusive discretion as to further permission to drill had been contemplated by the parties to be in the Sanitary District.
 
 
 49
 This intention in any event is fully and completely reflected in the express language employed by the original parties to the lease. We are unable to find any uncertainty in its expression which would have supported the trial judge's determination that the discretion to permit drilling was to be given only in the first instance to the Sanitary District and thereafter not to be withheld without good cause.
 
 
 50
 B. Implied Covenant of Good Faith Under Ohio Law.
 
 
 51
 The district court found that there was implied in every contract a duty of good faith, fair dealing and cooperation between the parties. As authority for this proposition, the district court relied upon the Restatement (Second) of Contracts Sec. 205 (1981) which provides:
 
 
 52
 Sec. 205. Duty of Good Faith and Fair Dealing
 
 
 53
 Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.
 
 
 54
 Section 205 is a new section of the Restatement of Contracts, having been added in 1979. As far as our research reveals the Ohio courts have neither expressly accepted nor rejected this legal theory. In at least some contexts, the Ohio courts have recognized that covenants of good faith are implied in contracts. See, e.g. Werner v. Biederman, 64 Ohio App. 423, 28 N.E.2d 957 (1940).
 
 
 55
 In asserting that Ohio courts would adopt section 205 GM also relies upon Randolph v. New England Mut. Life Ins. Co., 526 F.2d 1383 (6th Cir. 1975). In Randolph, the sole issue before the Sixth Circuit was whether a general agency contract executed April 27, 1966, was terminable by unilateral action of either party prior to its April 1, 1989, termination date.
 
 
 56
 'The Agency shall terminate automatically on the Normal Retirement Date or on the prior death of the General Agent, but except as provided in Section 14 each of the parties hereto shall have the right to terminate the Agency at any prior time upon giving sixty days' notice in writing.'
 
 
 57
 526 F.2d at 1385. The court in Randolph held that section 15 of the contract, while ahthorizing automatic termination 'without cause,' still does not permit either party to terminate in bad faith. Neither party cited an Ohio case directly on point, that is, implying or refusing to imply 'good faith' or 'cause' limitations on a facially unrestricted termination provision in a contract otherwise for definite duration. The court held that Ohio courts would not allow either party to terminate in bad faith. In so holding, the court relied on a line of cases holding that a principal may not terminate an agency agreement in bad faith as a device to escape the payment of a broker's commission. 526 F.2d at 1387 (citing Smith v. Frank R. Schoener, Inc., 94 Ohio App. 308, 311-12, 115 N.E.2d 25, 27 (1953)).
 
 
 58
 Whether the Ohio Supreme Court would adopt section 205 of the Restatement (Second) of Contracts is in our view uncertain at best. Further, we believe that federal courts run great risks in attempting to predict the future course of state law which is as yet undecided, especially when the effort may produce results counter to known existing state law. When this occurs, the result is too often to substitute personal predilection for the plain commands of Erie Railroad v. Tompkins, 304 U.S. 64, (1938). The Ohio law to which we refer is that which clearly holds that there can be no implied covenants in a contract in relation to any matter that is specifically covered by the written terms of the contract itself.
 
 
 59
 In Kachelmacher v. Laird, 92 Ohio St. 324, 110 N.E. 933, 933 Syllabus 1 (1915), the Supreme Court of Ohio held in its syllabus that 'there can be no implied covenants in a contract in relation to any matter that is specifically covered by the written terms of the contract itself.' In addition, in the syllabus of Blosser v. Enderlin, supra, 113 Ohio St. 121, 148 N.E. 393, 393 Syllabus 1 (1925), the Supreme Court of Ohio held that 'The agreement of parties to a written contract is to be ascertained from the language of the instrument, and there can be no intendment or implication inconsistent with the express terms thereof.' Though the cases are old, we find no indication that they are for that reason moribund.
 
 
 60
 The Sanitary District also contends that even if there was an implied covenant of good faith, it did not breach the covenant. The district court found that the Sanitary District had withheld approval for the drilling of the second well proposed by GM 'arbitrarily' and thus had breached the implied covenant of good faith. The Sanitary District listed nine reasons for its decision not to allow future drilling.[2] The Sanitary District's primary justification for not approving further drilling was the possible pollution of the water supply and the protection of the natural resource area. The district court found that these reasons were not rational and thus arbitrary because 'GM is a responsible driller utilizing state of the art techniques.' The court then held that this arbitrary refusal breached the implied covenant of good faith.
 
 
 61
 In Slater v. Motorists Mut. Ins. Co., 174 Ohio St. 148, 187 N.E.2d 45 (1962), plaintiff Slater brought suit against his insurance company claiming that the company's refusal to settle a claim when it had an opportunity to do so within the policy's limits constituted a lack of good faith. The court stated in its syllabus:
 
 
 62
 2. A lack of good faith is the equivalent of bad faith, and bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.
 
 
 63
 Here the district court found that the Sanitary District's refusal to approve the second well was not in good faith. It so found not because the Sanitary District's stated reasons were not rational, but rather because the district had no rational basis for belief that GM would not act with a proper respect for these considerations:
 
 
 64
 10. The evidence before the court establishes that MVSD's main concern in approving further drilling was and is the possible pollution of the water supply and the protection of the natural resource area. The evidence also supports a finding, however, that GM is a responsible driller utilizing state of the art techniques in brine disposal, that MVSD has never had a serious pollution problem because of GM's conduct on the first well, that GM has made concessions in the number of wells it would drill under the lease to comply with MVSD's spacing requirements, and that GM has at all times cooperated to modify its drilling proposals in deference to MVSD concerns. No rational reason has been advanced by the MVSD board for its refusal to allow the second well to go forward that has not been reasonably addressed by GM. This court can only conclude that the MVSD board is withholding approval of the second well arbitrarily in violation of the implied requirement that it exercise its right to approve further drilling in good faith.
 
 
 65
 General Motors Corp. v. Mahoning Valley Sanitary District, supra, slip op. at 13.
 
 
 66
 With respect to the district court's decision that there must be incorporated in each contract in Ohio a duty of good faith and fair dealing imposed upon each party in its performance and enforcement of the contract similar to that recognized by the Restatement of Contracts, section 205, we hold that such a generalized duty cannot be employed to modify the plain terms of the contract but only in construction of them, if at all. There would have been much more force to the argument advanced on behalf of GM had the lease provided, as contracts often do, that where consent is a part of the bilateral nature of the contract, such consent will not be unreasonably withheld. That language, of course, is not present here.
 
 
 67
 Also, to the extent that the district court found the action of the Sanitary District to have been 'not in good faith' we must respectfully disagree. At least nine specific concerns were expressed by the Sanitary District with respect to withholding of consent. The trial judge in holding that the Sanitary District's refusal to consent was arbitrary did not quarrel with the propriety of such concerns as legitimate considerations for such a body to entertain. Indeed the district court would be hard pressed to do so for the sole object of the Sanitary District's existence was to administer the lands and water systems within its control. Ohio Rev. Code Ann. Sec. 6115.04 (Baldwin 1981) provides:
 
 
 68
 Sanitary districts may be established for any of the following purposes:
 
 
 69
 (A) To prevent and correct the pollution of streams;
 
 
 70
 (B) To clean and improve stream channels for sanitary purposes;
 
 
 71
 (C) To regulate the flow of streams for sanitary purposes;
 
 
 72
 (D) To provide for the collection and disposal of sewage and other liquid wastes produced within the district;
 
 
 73
 (E) To provide a water supply for domestic, municipal, and public use within the district, and incident to those purposes and to enable their accomplishment to construct reservoirs, trunk sewers, intercepting sewers, siphons, pumping stations, wells, intakes, pipe lines, purification works, treatment and disposal works, to maintain, operate, and repair the same, to acquire additional water supplies by purchase, and to do all other things necessary for the fulfillment of the purposes of sections 6115.01 to 6115.79 of the Revised Code;
 
 
 74
 (F) To reduce population of biting arthropods and abate their breeding places, and incident to those purposes to purchase supplies, materials, and equipment, to employ technicians and laborers, to build, construct, maintain, and repair such structures, devices, and improvements, to conduct studies and surveys of the populations of biting arthropods and of the incidence or spread within or among human or animal populations of diseases transmitted by biting arthropods, and to do such other things as are necessary or desirable to accomplish those purposes;
 
 
 75
 (G) To collect and dispose of garbage;
 
 
 76
 (H) To collect and dispose of any other refuse that may become a menace to health.
 
 
 77
 The legislative or governmental powers vested in the Sanitary District by, the cited Ohio statute seem quite limited but the power of the Sanitary District to enter into the lease in question is not challenged here. At the same time, the obligation and the primary concerns which the Ohio statutes place upon the Sanitary District are clear indeed. Anyone administering those powers must necessarily be alert to those purposes in all actions which could potentially endanger the water supply. Certainly GM's predecessor in interest had to know this and these responsibilities must remain paramount in the Sanitary District and undelegable.
 
 II.
 
 78
 The district judge found the Sanitary District's refusal to permit further drilling to be arbitrary because in his judgment there had been no showing that GM had been irresponsible in the past and hence might be irresponsible in the future. This in our view completely begs this question of responsibility placed upon the Sanitary District by the statute. In effect, it rewrites the contract by providing that the decision to permit or refuse further drilling must be vested not in the Sanitary District or its managers but, in event of disagreement, be vested in a third party. The contract calls for no arbitration and yet that is the effect of the district court's decision. The Sanitary District is administered by a board of directors who are empowered to construct and maintain 'such works as are necessary to carry out the purposes of the District and improvement of sanitation and water supply.' Ohio Rev. Code Ann. Sec. 6115.18 (Baldwin 1953). We cannot believe that the Ohio courts would lightly permit the delegation of such statutory responsibility to be inferred from a document which appears on its face to hold exactly the contrary.
 
 
 79
 Finally, we are unable to agree with the conclusion that the effect of the Sanitary District's denial of the right to drill would render their contract a nullity. On the contrary, the lease remains valid. Having commenced the drilling, GM has a right to continue the extraction of oil from the well already in existence provided of course the necessary consideration was paid. There remains ample incentive for the Sanitary District to agree to future drilling rights for by denying them it is denying itself the profits which the exercise of such rights might bring. It may or may not be true that the ultimate decision was subjectively made by the board of directors because the board determined that a greater percentage of the profits might be obtained by renegotiation. These are economic considerations which the parties are left by their contract to ponder. At the same time GM has the right to preclude any other party from drilling during the term of the remaining years of the lease even if the Sanitary District might desire to make a better deal elsewhere. We do not consider the give and take of the contractual relationships of these parties to be either inequitable or overbearing and we see no reason why the plain language of the contract should not continue to govern their relationships.
 
 
 80
 REVERSED and REMANDED with instructions to enter judgment in favor of the Sanitary District.
 
 
 
 *
 Honorable Avern Cohn, Judge for the United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The rule in Ohio is that the precedent in each case is to be found in the syllabus rather than in the text of the opinion. Cassidy v. Glossip, 12 Ohio St. 2d 17, 231 N.E.2d 64 (1967)
 
 
 [2]
 1. There will be pollution due to oil brine, silt, detergent, etc
 
 
 [2]
 Two thousand additional acres of land may be flooded in the future if the Meander Reservoir is expanded
 
 
 [3]
 Twenty-one miles of trails will be disturbed by gas line construction
 
 
 [4]
 At least one hundred acres of trees will be destroyed
 
 
 [5]
 Three lake crossings with gas lines are anticipated
 
 
 [6]
 All future use of land will be curtailed; i.e., clear-cutting, planting, building and flooding
 
 
 [7]
 There will be a threat of fire and/or vandalism due to the constant traffic of well drillers and inspectors into District property
 
 
 [8]
 Gas pipe totaling 128,000 lineal feet (24 miles) will be installed inside the District
 
 
 [9]
 To complete well drilling operation in ten years as stated by GM officials 12/8/82, and planning to install 2 in 1983, it would take a drilling program of 5 wells/year for 7 years and 6 wells/year for 2 years to complete the project
 Compendium of exhibits, No. 14 (January 5, 1983 minutes of meeting of board of directors of Sanitary District).