## BUSAM MOTOR SALES, Inc. v. FORD MOTOR CO.

### Civ. No. 1824.

United States District Court
S. D. Ohio, W. D.

Aug. 31, 1949.

Robert N. Gorman, Cincinnati, Ohio, Larz R. Hammel, Cincinnati, Ohio, for plaintiff.

Taft, Stettinius & Hollister, Cincinnati, Ohio, for defendant.

DRUFFEL, District Judge.

Plaintiff commenced its action against defendant alleging among other things that on March 4, 1946, plaintiff company was a designated and authorized distributor of motor vehicles, parts, and accessories for defendant company and that by terms of the agreement between the parties defend- ant agreed to sell, and plaintiff agreed to purchase for resale for use Ford passenger automobiles, commercial automobiles, trucks, and parts and accessories therefor, and parts and accessories for Mercury and Lincoln automobiles, It was expressly agreed that plaintiff was to act as a dealer and not as an agent, and plaintiff agreed to maintain his business in a manner accepta- ble to the defendant; that by terms of the agreement it could be terminated at any time at the will of either party by written notice; the agreement further provided that it was to be construed in accordance with the laws of the State of Michigan.

Plaintiff claimed that by registered letter dated July 2, 1947, defendant notified plain- tiff of its intention to terminate the sales agreement effective sixty days after receipt of the notice, which would be September 5, 1947. Plaintiff further claimed that said purported termination was not in good faith on the part of the defendant company and was a fraud on the rights of the plain- tiff and further that under the laws of the State of Michigan the option to terminate an agreement of this nature may be exer- cised only in good faith.

Plaintiff further claimed that at the time of receipt of the notice of cancellation it had received 359 orders for delivery of Ford automobiles from various customers and that between July 7, 1947, and Septem- ber 5, 1947, defendant company supplied 43 cars to the plaintiff for delivery on the or- ders obtained, leaving unfilled on Septem- ber 5, 1947, orders for 316 Ford motor vehicles. Plaintiff further claimed that the refusal of the defendant to deliver suffi- cient automobiles to plaintiff company to fill said 316 orders was done to deprive plaintiff company of a profit on said orders, and that the purported termination of agreement was not made in good faith but solely to deprive plaintiff of the profits it would have received upon the filling of the said 316 orders in the sum of $105,768.- 00, and by reason thereof, plaintiff com- pany had been damaged to that extent. Plaintiff further claimed $4800.00 damages by way of expenses incurred in the prepara- tion of plans, estimates, surveys, and speci- fications for a new building which it did

not require in view of the cancellation of said agreement.

Defendant answered generally admitting the agreement authorizing plaintiff company as a dealer in its motor vehicles etc., and claimed that said agreement did not obligate the defendant company to accept any orders from the plaintiff, but instead expressly provided that the defendant company agreed to give careful consideration to all orders received from the dealer but expressly reserves the right to follow or depart from such orders, and that defendant company shall in no way be liable for failure to ship, or for delay, and further answered that under the laws of the State of Michigan such an agreement can be terminated at any time and for any reason at the will of either party and that damages for termination may not be recovered. Defendant admitted further that it notified plaintiff of its intention to terminate the sales agreement and denies that the termination was not made in good faith, and denies that it was made to deprive plaintiff of profits, and denies that it was in any way a fraud on the rights of the plaintiff, and for further answer the defendant states that it filled all orders received from the plaintiff, and that the plaintiff had never ordered from the defendant any of the 316 Ford motor vehicles referred to in the complaint.

At the conclusion of the trial a verdict of $87,000.00 damages was returned by the jury in favor of plaintiff company.

This matter is now before the court on a motion for a new trial and judgment for defendant notwithstanding the verdict.

In the determination of these motions the first issue to be considered must be the issue of the lack of good faith and fraud on the part of the defendant company as alleged by the plaintiff company.

Before proceeding to a consideration of the evidence offered by the plaintiff in support of its allegations of lack of good faith and fraud, certain provisions of the contract must also be considered, to wit: "dealer agrees to maintain a place of business * * * · located in a place and equipped in a manner acceptable to company * * * to install and maintain therein the tools, machinery, and equipment recommended by the company * * * to employ sufficient, competent salesmen to solicit adequately all potential purchasers of the company products in the community in which dealer is located, and sufficient, competent service mechanics to render prompt, efficient service to owners of company products * * * etc."

To support plaintiff's claim that the contract was cancelled in bad faith and in fraud of plaintiff's rights Joseph E. Busam, president of plaintiff company testified that since 1912 that plaintiff company and its predecessors owned solely at one time by Joseph G. Busam, his father, and later as a partnership consisting of Joseph G. Busam and Joseph E. Busam, had been the authorized distributors of Ford automobiles; that shortly before the death of Joseph G. Busam, which occurred January 23, 1946, Joseph E. Busam was released from the Army in order to take over the business in view of the pending death of his father from a malignancy; that the entire partnership was taken over by him and that he had made an application to defendant company for a franchise; that he thereupon organized a corporation, plaintiff herein, which was granted a franchise by defendant company; that the company had recently moved from an old location at 6300 Vine Street, Elmwood Place, to 7315 Vine Street into a new building; that by reason of wartime restrictions on the use of building materials, they were unable to immediately provide space for new cars, showrooms, etc.; that new cars were not then in production but meanwhile the defendant company orally and in writing urged plaintiff to secure as many orders as possible for Ford products; that from time to time district supervisors of defendant company would call and discuss the affairs of plaintiff company making suggestions which they thought would help the agency in its service, including the suggested dismissal from service of two employees of the company which latter suggestion the witness explained he not only rejected, but resented. It was testified too, among other things that plaintiff company had considered plans for remodeling and planned to take care of

the anticipated increase in business when new automobiles were available, but because of the continued restrictions on the use of building materials for other than essential uses, no action was taken to remodel the present building or to expand its facilities; that defendant company notwithstanding continued its pressure for expansion to an extent plaintiff company considered unreasonable and unfair. Mr. Busam further testified as time went by he was subjected to regular visits by two district supervisors; that he was later invited to the office of the District Manager, Mr. Lester, where he was subjected to continual criticism for his lack of effort, etc., and that later along it was suggested that the company felt that he might be more successful if he accepted a new location with a smaller dealership. This he ultimately rejected and some months later when he took his mother who was ill to California, and was there a couple of months that Mr. Lester acting on an alleged complaint of lack of management because of his absence from the business, personally made an inspection of the plant, that when he returned to Cincinnati, he visited Mr. Lester, who suggested among other things that his lack of willingness to comply with their requests to increase his facilities notwithstanding the continued building restrictions, meant that perhaps they may have to cancel his franchise; that later along one of the district supervisors visited him on several occasions and suggested that perhaps if he were willing to surrender his franchise that they would offer him delivery of fifty and ultimately seventy-five cars. This he refused; that in view of the increased pressure on him and what appeared to him to be unreasonable requests, he appealed by telephone directly to a top official of the Ford Motor Company at Dearborn, Michigan, whom he personally knew, requesting this official's assistance to overcome the activities of the local Ford supervisors; that eventually he received a notice of the termination of his contract, and in compliance with the terms of the contract delivered to defendant company, orders for 316 Ford motor vehicles; that had he received the delivery of the 316 automobiles he would have received a profit of $105,768.00. He further testified that in an effort to comply with the request of defendant company to remodel or erect a new building, that he had employed architects and although no alterations or modifications to the present building was had, or new building started, he was obliged to and did expend $4800.00 for which he also claimed damages.

On its part the defendant company offered testimony that because of the long and pleasant relations between the Senior Busam, and until his death that they were very anxious to give Junior Busam an opportunity to continue as a Ford dealer, and in this connection offered defendant's exhibit recommending that a franchise be granted Junior Busam, and among other things saying:

"Mr. Joseph E. Busam will be the active head of the dealership and before entering the armed forces he was associated actively with his father in the operation of the business and has a sound knowledge of the business. Further, he is young, well educated and we believe he will improve the operation of the dealership." (Defendant's exhibit T, being a letter from Mr. J. K. Lester, Manager, to Mr. C. R. Beacham, Regional Manager)

Mr. Lester testified further that prior to recommending the granting of the franchise it was impressed upon Mr. Busam as to the necessity of expanding his facilities to take care of the anticipated business in new cars when they reached the market, to which suggestion Mr. Busam readily agreed. As the months went on, however, and the delivery date of new cars was rapidly approaching, Mr. Busam was apparently making no effort to expand his facilities. From time to time, Mr. Lester would receive reports from the Busam Motor Sales Company concerning the operation of its business, some of which indicated in their opinion that the business was not being successfully operated, and because of the losses sustained they could not stay in business very long. He further stated that because of the large territory involved, the Busam Motor Sales Company was classed as a metropolitan dealer with a sales poten-

tial of 800 to 1000 cars, and it was their view that it would be necessary for him to expand his facilities promptly to successfully operate; that he would occasionally receive reports from his assistants which indicated a lack of cooperativeness on the part of Busam; that sometime in January of 1947, he had been notified by a Mr. John Doyle of the fact that he had an order on file with Busam for a new Ford, and that Mr. Doyle had called Busam to inquire just where he stood on the list, and was informed that Mr. Busam was sojourning in California, and that they were unable to tell him anything until Mr. Busam returned; that as a result of this complaint, Mr. Lester personally visited the Busam agency, and by way of explaining the necessity for expanded facilities, pointed out that the Busam building had no showroom, had no office, that its parts department had very limited space, and the shop could only accommodate seven cars, which in his view confirmed the necessity for immediate expansion if he were to operate as a metropolitan dealer; that he asked Mr. Busam to come in to see him on his return from California, and explained his concern over the ability of Busam to make good as a metropolitan dealer in view of the occurrences of the past few months; that Mr. Busam promised immediate cooperation in this respect but that matters did not get better; that as time approached for delivery of new cars Busam was without facilities to display them, and as a result Busam was forced to erect a tent adjoining his building to display the new cars when delivered. From their viewpoint Busam was not measuring up to their earlier anticipations, but still not to break relations offered Busam a smaller dealership which was declined; that thereafter he authorized one of his subordinates to offer Mr. Busam fifty new automobiles as an inducement to voluntarily surrender his franchise, that Mr. Busam asked for time to consider, and shortly thereafter advised them that he would not voluntarily surrender his franchise; that as a result they had no alternative under the circumstances but to terminate the franchise, which was done; that Mr. Busam turned over to defendant company after the termination approximately 316 orders, classified: 10 which had been accepted by the dealer and on which there were deposits; 53 fleet orders; 51 that had not been accepted by the Busam Company, and on which there were deposits approximating $2900.00; 11 which Busam had accepted and on which there were no deposits, and 177 unaccepted orders and on which there were no deposits; that the company in turn returned the deposits to the customers who had made them, and notified all others of the cancellation of the Busam franchise, and that they were free to do business elsewhere.

The above resume constitutes substantially the important and relevant portions of the controlling evidence, and in the opinion of the court, giving the most liberal interpretation to plaintiff's evidence, there is a complete failure of direct evidence of lack of good faith and no evidence of any kind even suggesting fraud on the part of the defendant company in its operations and dealings with plaintiff company.

Upon analysis, the best that can be said for plaintiff's allegations of lack of good faith and fraud and the evidence offered in support thereof, is that it is made up of a series of inferences upon inferences suggested by counsel for plaintiff, of which plaintiff's Exhibit 38 is illustrative:

Plaintiff's Exhibit 38

"Ford Motor Company
Cincinnati 2, Ohio
July 17, 1946.
"Personal

"Busam Motor Sales, Inc.,
7315 Vine Street,
Cincinnati 16, Ohio.
"Attention: Mr. Joe Busam, Jr.
"Gentlemen:

"Your statement for June has been received and hurriedly analyzed and we regret to say that the inevitable has happened. By this we mean that without a reasonably fair number of new cars your present physical set-up will not permit you to operate at a profit, particularly as your operation is set up as reflected by your June statement.

"It is our desire to point out some of the weaknesses in your operation and trust that

our criticisms will be accepted in the right spirit.

"To begin with, during June, 6 mechanics in your shop turned in $1,541 worth of Customer Labor Sales or an average of about $257 per man. At your labor rate of a minimum of $2.50 per hour these mechanics should have easily returned to you between $350 and $400 of work instead of the average of $257. Your body shop for the month showed a loss of $317.23. Why continue the operation of a body shop if it is going to cost you money. Have the work done on the outside. We also notice under Expense Account that you have listed under Salesmen's Salaries and Commissions $750 for the month of June. It is presumed that this is for a used car saleman and, according to the figures on your statement it cost you $750 in salaries to make a gross profit of $263.56 on used car sales. This is poor business.

"Under Salaries and Wages—All Others, for June there is an expense of $2,025.01. It is presumed that the salaries of 2 men in your Parts Department, your bookkeeper and possibly a porter is included in this figure. If so, this amount appears to be unusually large for this number of employees. You list, we notice, 2 miscellaneous employees, who might also have been included in this salaries and wages of all others. However, even with this the individual salaries of these persons would be exceedingly high. All told, your operating statement proves the one thing that we have constantly talked to you about for the past several months, namely, that for a volume dealer and the expense necessary to operate a good sized dealership you do not have the facilities to conduct a service operation in keeping with your expense. To be perfectly frank, you cannot continue to operate at a loss and stay in business for any length of time and certainly we cannot see how you can participate in our leadership drive unless your gross profit from service sales tremendously increases and with your physical set-up this is an impossibility.

"If you have any comments we would be pleased to hear from you and we would appreciate some comments on the item of $2,025 for Salaries and Wages—All Others, as well as the $750, Salesmen's Salaries and Commissions account.

"The writer will be gone for a few days the balance of this week. However, he will be back on the job Monday or Tuesday of next week if you care to drop by the office and I will be happy to talk to you further with reference to what we consider the rather precarious position your operation is in.

"Yours very truly,
Ford Motor Company
"(Signed) J. K. Lester
District Manager"
"JKL:jc"

A fair and careful anaylsis of this letter shows that Mr. Lester is trying to help Mr. Busam; that while it is critical, not the slightest hostility is shown, but in his argument to the jury plaintiff's counsel effectively inferred all kinds of malice and lack of good faith, etc. by reading between the lines, and tying it in with the remarks and activities of the supervisors during the period of the agreement.

[1] It should be noted also that this letter was written four months after Mr. Lester's laudatory remarks about Mr. Busam in recommending that he be granted a franchise. So it would be logical to assume that Mr. Lester is trying to produce results to justify his previous high opinion of Mr. Busam, rather than to defraud him of his franchise.

"Inability to meet legal requirements of evidence in support of a theory does not brush aside rules and open the way to supposition and inferences without evidentiary support. Presumptions and inferences may be drawn from facts established, but may not rest presumption upon presumption, or inference upon inference." Standard Drug Store v. A. E. Wood & Co., 227 Mich. 333, 338, 198 N.W. 960, 961.

"The decisions are generally agreed that a presumption must rest upon facts proved by direct evidence and cannot be based upon, or inferred from, another presumption. Thus whenever circumstantial evidence is relied upon to prove a fact, the circumstances must be proved and cannot be presumed." 20 Am.Jur. Sec. 164.

796

■ It being the law that contracts terminable at will are binding on both parties until right of cancellation reserved is exercised by cancellation on the part of one or the other, provided further that the option to terminate at will must be exercised in good faith, J. R. Watkins Co. v. Rich, 254 Mich. 82, 235 N.W. 845, and the obligation to sustain the allegations of lack of good faith and fraud being upon the plaintiff, it is the finding of this court that plaintiff has failed to sustain the burden of proof, and by reason thereof a new trial must be granted.

Although the foregoing is determinative of the rights of the parties on the motion for a new trial, the size of the jury verdict, ($87,000.00) calls for further consideration of the evidence offered by plaintiff in support of its claim of a loss of profits by reason of the cancellation amounting to $105,-768.00. This was the amount fixed by Mr. Busam as representing the gross profit on the 316 automobiles, which he claimed defendant failed to deliver.

As previously stated, at the termination of the agreement plaintiff turned over to defendant 316 so-called orders. Since the jury in arriving at the amount of its verdict had of necessity to include the loss of profits on the 177 unaccepted orders with no deposits, this classification will be discussed at length to determine whether they, standing alone, support in any way the verdict of the jury.

At the outset it should be understood that not one of the 177 so-called orders were binding on either the customer or the dealer. Although nearly all had been signed by the customer, not one had been signed by the dealer or his agent, and further it is expressly stated in the order form "This order is not binding on dealer unti. ..ccepted in writing." In every instance the order merely lists the name of the would-be purchaser with a signature on a line for "Buyer's Signature." In none of these orders is there a price stated for the new car; no price is suggested for the used car which is to be traded.

To illustrate: One order form, purchaser is to buy "a 1947 Ford; 41 Ford Sedan may not trade;" Another, "1946 Ford, make of used car—Ford—Type 1938;" Another, "Please enter my order for 4 door Ford; realize present conditions—will just say if and when." Another: "1947 Sedan Coupe, any color, 6 or 8 cylinder;" Another, "47 Ford, 37 Ford to trade.", etc.

In not one of the 177 orders is there a single indication that the customer and dealer had arrived at a deal, and as Mr. Lester testified, defendant company would not consider them as bona fide orders until the deal was actually made; "that usually the customer in shopping around made the best deal for the top dollar."

Upon analysis it would appear that the jury accepted Mr. Busam's testimony as to the amount of the loss of profits by assuming that a sale and delivery would be made on each and every one of these unaccepted and nonbinding orders, and that Mr. Busam would have made the profit he claimed.

■ In the opinion of the court here, these unaccepted orders do not constitute binding contracts and since the dealer is not bound to deliver to the customer, he is unable to sustain a claim for loss of profits based on these so-called orders alone.

In addition to the foregoing, an important and compelling reason appears why the verdict of the jury here must be set aside. In the case of Transit Bus Sales v. Kalamazoo Coaches, Inc. (Kalamazoo Coach, Inc., v. Transit Bus Sales), the Court of Appeals for the Sixth Circuit, affirming a Michigan United States District Court, 145 F.2d 804, held that no recovery may be had to a distributor for sales on the ground that the measure of distributor's damages was the profit which it might have realized had it been permitted to fully perform the contract where there was no proof on the part of the distributor of its cost of making sales, because there was no basis upon which the jury could arrive at its loss of profits, the burden being on the plaintiff to establish with reasonable certainty, the amount it would have had to expend in making sales.

■ That is exactly the case here. Busam simply testified as to the gross profit he would have received had delivery been made of the 316 cars. No breakdown was

given as to the expenses to be charged against those sales, so that there was no proof on the part of the plaintiff of its cost of making sales, leaving no basis upon which the jury could arrive at its loss of profits.

Under these circumstances and in view of the above decision of the Court of Appeals, this court has no alternative but to grant a new trial on this additional ground.

It is the opinion of the court that the element of good faith under the Michigan law remains a question of fact for the jury, so the motion for judgment notwithstanding the verdict must be overruled.