MORIN BUILDING PRODUCTS COM-
PANY, INC., Plaintiff-Appellee,

v.

BAYSTONE CONSTRUCTION, INC.,
Defendant-Appellant.

No. 82–2451.

United States Court of Appeals,
Seventh Circuit.

Argued May 12, 1983.

Decided Sept. 16, 1983.

Alan H. Lobley, Ice, Miller, Donadio & Ryan, Indianapolis, Ind., for defendant-appellant.

Craig Pinkus, Mitchell, Hurst, Pinkus, Jacobs & Dick, Indianapolis, Ind., for plaintiff-appellee.

Before POSNER and COFFEY, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

This appeal from a judgment for the plaintiff in a diversity suit requires us to interpret Indiana's common law of contracts. General Motors, which is not a party to this case, hired Baystone Construction, Inc., the defendant, to build an addition to a Chevrolet plant in Muncie, Indiana. Baystone hired Morin Building Products Company, the plaintiff, to supply and erect the aluminum walls for the addition. The contract required that the exterior siding of the walls be of "aluminum type 3003, not less than 18 B & S gauge, with a mill finish and stucco embossed surface texture to match finish and texture of existing metal siding." The contract also provided "that all work shall be done subject to the final approval of the Architect or Owner's [General Motors'] authorized agent, and his decision in matters relating to artistic effect shall be final, if within the terms of the Contract Documents"; and that "should any dispute arise as to the quality or fitness of materials or workmanship, the decision as to acceptability shall rest strictly with the Owner, based on the requirement that all work done or materials furnished shall be first class in every respect. What is usual or customary in erecting other buildings shall in no wise enter into any consideration or decision."

Morin put up the walls. But viewed in bright sunlight from an acute angle the exterior siding did not give the impression of having a uniform finish, and General Motors' representative rejected it. Baystone removed Morin's siding and hired another subcontractor to replace it. General Motors approved the replacement siding. Baystone refused to pay Morin the balance of the contract price ($23,000) and Morin brought this suit for the balance, and won.

The only issue on appeal is the correctness of a jury instruction which, after quoting the contractual provisions requiring that the owner (General Motors) be satisfied with the contractor's (Morin's) work, states: "Notwithstanding the apparent finality of the foregoing language, however, the general rule applying to satisfaction in the case of contracts for the construction of commercial buildings is that the satisfaction clause must be determined by objective criteria. Under this standard, the question is not whether the owner was satisfied in fact, but whether the owner, as ·a reasonable person, should have been satisfied with the materials and workmanship in question." There was much evidence that General Motors' rejection of Morin's exterior siding had been totally unreasonable. Not only was the lack of absolute uniformity in the finish of the walls a seemingly trivial defect given the strictly utilitarian purpose of the building that they enclosed, but it may have been inevitable; "mill finish sheet" is defined in the trade as "sheet having a nonuniform finish which may vary from sheet to sheet and within a sheet, and may not be entirely free from stains or oil." If the instruction was correct, so was the judgment. But if the instruction was incorrect—if the proper standard is not whether a reasonable man would have been satisfied with Morin's exterior siding but whether General Motors' authorized representative in fact was—then there must be a new trial to determine whether he really was dissatisfied, or whether he was not and the rejection therefore was in bad faith.

Some cases hold that if the contract provides that the seller's performance must be to the buyer's satisfaction, his rejection—

however unreasonable—of the seller's performance is not a breach of the contract unless the rejection is in bad faith. See, e.g., *Stone Mountain Properties, Ltd. v. Helmer,* 139 Ga.App. 865, 869, 229 S.E.2d 779, 783 (1976). But most cases conform to the position stated in section 228 of the Restatement (Second) of Contracts (1979): if "it is practicable to determine whether a reasonable person in the position of the obligor would be satisfied, an interpretation is preferred under which the condition [that the obligor be satisfied with the obligee's performance] occurs if such a reasonable person in the position of the obligor would be satisfied." See Farnsworth, Contracts 556–59 (1982); Annot., 44 A.L.R.2d 1114, 1117, 1119–20 (1955). *Indiana Tri-City Plaza Bowl, Inc. v. Estate of Glueck,* 422 N.E.2d 670, 675 (Ind.App.1981), consistently with hints in earlier Indiana cases, see *Andis v. Personett,* 108 Ind. 202, 206, 9 N.E. 101, 103 (1886); *Semon, Bache & Co. v. Coppes, Zook & Mutschler Co.,* 35 Ind.App. 351, 355, 74 N.E. 41, 43 (1905), adopts the majority position as the law of Indiana.

We do not understand the majority position to be paternalistic; and paternalism would be out of place in a case such as this, where the subcontractor is a substantial multistate enterprise. The requirement of reasonableness is read into a contract not to protect the weaker party but to approximate what the parties would have expressly provided with respect to a contingency that they did not foresee, if they had foreseen it. Therefore the requirement is not read into every contract, because it is not always a reliable guide to the parties' intentions. In particular, the presumption that the performing party would not have wanted to put himself at the mercy of the paying party's whim is overcome when the nature of the performance contracted for is such that there are no objective standards to guide the court. It cannot be assumed in such a case that the parties would have wanted a court to second-guess the buyer's rejection. So "the reasonable person standard is employed when the contract involves commercial quality, operative fitness, or mechanical utility which other know-

ledgeable persons can judge .... The standard of good faith is employed when the contract involves personal aesthetics or fancy." *Indiana Tri-City Plaza Bowl, Inc. v. Estate of Glueck, supra,* 422 N.E.2d at 675; see also *Action Engineering v. Martin Marietta Aluminum,* 670 F.2d 456, 460–61 (3d Cir.1982).

We have to decide which category the contract between Baystone and Morin belongs in. The particular in which Morin's aluminum siding was found wanting was its appearance, which may seem quintessentially a matter of "personal aesthetics," or as the contract put it, "artistic effect." But it is easy to imagine situations where this would not be so. Suppose the manager of a steel plant rejected a shipment of pig iron because he did not think the pigs had a pretty shape. The reasonable-man standard would be applied even if the contract had an "acceptability shall rest strictly with the Owner" clause, for it would be fantastic to think that the iron supplier would have subjected his contract rights to the whimsy of the buyer's agent. At the other extreme would be a contract to paint a portrait, the buyer having reserved the right to reject the portrait if it did not satisfy him. Such a buyer wants a portrait that will please him rather than a jury, even a jury of connoisseurs, so the only question would be his good faith in rejecting the portrait. *Gibson v. Cranage,* 39 Mich. 49 (1878).

This case is closer to the first example than to the second. The building for which the aluminum siding was intended was a factory—not usually intended to be a thing of beauty. That aesthetic considerations were decidedly secondary to considerations of function and cost is suggested by the fact that the contract specified mill-finish aluminum, which is unpainted. There is much debate in the record over whether it is even possible to ensure a uniform finish within and among sheets, but it is at least clear that mill finish usually is not uniform. If General Motors and Baystone had wanted a uniform finish they would in all likelihood have ordered a painted siding. Whether Morin's siding achieved a reasona-

ble uniformity amounting to satisfactory commercial quality was susceptible of objective judgment; in the language of the Restatement, a reasonableness standard was "practicable."

But this means only that a requirement of reasonableness would be read into this contract if it contained a standard owner's satisfaction clause, which it did not; and since the ultimate touchstone of decision must be the intent of the parties to the contract we must consider the actual language they used. The contract refers explicitly to "artistic effect," a choice of words that may seem deliberately designed to put the contract in the "personal aesthetics" category whatever an outside observer might think. But the reference appears as number 17 in a list of conditions in a general purpose form contract. And the words "artistic effect" are immediately followed by the qualifying phrase, "if within the terms of the Contract Documents," which suggests that the "artistic effect" clause is limited to contracts in which artistic effect is one of the things the buyer is aiming for; it is not clear that he was here. The other clause on which Baystone relies, relating to the quality or fitness of workmanship and materials, may seem all-encompassing, but it is qualified by the phrase, "based on the requirement that all work done or materials furnished shall be first class in every respect"—and it is not clear that Morin's were not. This clause also was not drafted for this contract; it was incorporated by reference to another form contract (the Chevrolet Division's "Contract General Conditions"), of which it is paragraph 35. We do not disparage form contracts, without which the commercial life of the nation would grind to a halt. But we are left with more than a suspicion that the artistic-effect and quality-fitness clauses in the form contract used here were not intended to cover the aesthetics of a mill-finish aluminum factory wall.

If we are right, Morin might prevail even under the minority position, which makes good faith the only standard but presupposes that the contract conditioned acceptance of performance on the buyer's satisfaction in the particular respect in which he was dissatisfied. Maybe this contract was not intended to allow General Motors to reject the aluminum siding on the basis of artistic effect. It would not follow that the contract put Morin under no obligations whatsoever with regard to uniformity of finish. The contract expressly required it to use aluminum having "a mill finish ... to match finish ... of existing metal siding." The jury was asked to decide whether a reasonable man would have found that Morin had used aluminum sufficiently uniform to satisfy the matching requirement. This was the right standard if, as we believe, the parties would have adopted it had they foreseen this dispute. It is unlikely that Morin intended to bind itself to a higher and perhaps unattainable standard of achieving whatever perfection of matching that General Motors' agent insisted on, or that General Motors would have required Baystone to submit to such a standard. Because it is difficult—maybe impossible—to achieve a uniform finish with mill-finish aluminum, Morin would have been running a considerable risk of rejection if it had agreed to such a condition, and it therefore could have been expected to demand a compensating increase in the contract price. This would have required General Motors to pay a premium to obtain a freedom of action that it could not have thought terribly important, since its objective was not aesthetic. If a uniform finish was important to it, it could have gotten such a finish by specifying painted siding.

All this is conjecture; we do not know how important the aesthetics were to General Motors when the contract was signed or how difficult it really would have been to obtain the uniformity of finish it desired. The fact that General Motors accepted the replacement siding proves little, for there is evidence that the replacement siding produced the same striped effect, when viewed from an acute angle in bright sunlight, that Morin's had. When in doubt on a difficult issue of state law it is only prudent to defer to the view of the district judge, *Murphy v.*

*White Hen Pantry Co.,* 691 F.2d 350, 354 (7th Cir.1982), here an experienced Indiana lawyer who thought this the type of contract where the buyer cannot unreasonably withhold approval of the seller's performance.

■ Lest this conclusion be thought to strike at the foundations of freedom of contract, we repeat that if it appeared from the language or circumstances of the contract that the parties really intended General Motors to have the right to reject Morin's work for failure to satisfy the private aesthetic taste of General Motors' representative, the rejection would have been proper even if unreasonable. But the contract is ambiguous because of the qualifications with which the terms "artistic effect" and "decision as to acceptability" are hedged about, and the circumstances suggest that the parties probably did not intend to subject Morin's rights to aesthetic whim.

AFFIRMED.