**TRIANGLE MINING CO., INC., and Terteling Land Company, Plaintiffs-Appellants,**

v.

**STAUFFER CHEMICAL COMPANY, Defendant-Appellee.**

No. 84–3516.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 9, 1984.

Decided Jan. 15, 1985.

As Amended on Denial of Rehearing Feb. 8, 1985.

---

Jeffrey A. Strother, Moffatt, Thomas, Barrett & Blanton, Boise, Idaho, for plaintiffs-appellants.

Carl P. Burke, Elam, Burke, Evans, Boyd & Koontz, Boise, Idaho, for defendant-appellee.

Before WRIGHT, SNEED, and ALARCON, Circuit Judges.

SNEED, Circuit Judge: ·

Triangle Mining Co. (Triangle) appeals from the district court's award of summary judgment against it and in favor of Stauffer Chemical Co. (Stauffer) and from the district court's denial of a motion in limine. The district court had jurisdiction under 28 U.S.C. § 1332. This court has jurisdiction over Triangle's timely appeal under 28 U.S.C. § 1291. We affirm.

## I.

### FACTS

This case arises from two interrelated written contracts, both dated June 30, 1967, between Triangle's predecessor in interest, J.A. Terteling and Sons (Terteling),[1] and Stauffer. Under the first contract, Terteling transferred its interest in various phosphate mineral leases in southeastern Idaho to Stauffer, in exchange for $8,000,000, which Stauffer paid. Under the second, Terteling undertook to mine four of the leases it had sold to Stauffer and to supply Stauffer's requirements for phosphates. The mining contract also limited the amount of phosphate that Terteling was obliged to deliver and that Stauffer was obliged to accept in each contract year. By its terms, the contract was to remain in force until Terteling had extracted 10,000,000 tons of ore. To obtain certain tax benefits, however, the parties agreed that either could terminate the mining contract at any time upon ninety days notice. It is Stauffer's efforts to terminate its obligations under the mining agreement that are the focus of this litigation.

The mining contract contained two liquidated damages provisions. The first, set forth in section 16(c), required Stauffer to pay a penalty based on the number of unmined tons remaining at the time of termination.[2] The second, appearing in section 16(b)(2), was premised on the parties' initial understanding that Terteling would operate the mines only during those "seasons of the year in which weather conditions favor such mining operations." Recognizing that seasonal mining entails making preparatory expenditures, the parties sought to protect themselves against the risk that one party would terminate after the other had incurred costs in anticipation of that year's mining season, but before their recoupment was possible. To that end, section 16(b)(2) required payment of liquidated damages "equal to the amount of ... funds expended by and the

1. As the relationship developed, Terteling transferred its interest in the mining agreement to several related entities. Terteling itself was a general partnership comprising Joe Terteling, Nick Terteling, and Ken Terteling as general partners. On December 31, 1973, Terteling assigned the contract to Terteling Operations Co., Ltd. (Terteling Operations), a limited partnership with Joe Terteling serving as general partner and Nick and Ken Terteling serving as limited partners. Finally, in December 1977, Terteling Operations assigned the contract to Triangle, a corporation held by Nick and Ken Terteling as shareholders.

2. Section 16(c) provides, in relevant part:

The parties hereto recognize that Terteling is entering into this Agreement with the ex-

pectation of delivering at least 10,000,000 tons of furnace grade and acidulation grade phosphate rock ... and will incur considerable initial expense which it normally would amortize over the term of this Agreement. Therefore, the parties agree that if Stauffer exercises its privilege to terminate this Agreement prior to delivery by Terteling of at least 10,000,000 tons of furnace grade and acidulation grade phosphate rock, Stauffer will pay Terteling a penalty for each ton of rock up to 10,000,000 which remains undelivered as of the effective date of termination.... This payment shall be Terteling's sole and only remedy for any loss, expense or damage it might suffer as a result of such termination. Clerk's Record, Docket No. 1, Exhibit 1.

amount of ... irrevocable commitments to expend funds made by such other party to the extent they cannot, because of the time of year at which termination of this agreement occurs ..., be recouped by such other party." [3]

At the outset of operations in 1967, Terteling operated the mines on a seasonal basis, as contemplated by the contract. On November 3, 1971, however, Terteling informed Stauffer of its intent to operate the mines on a year-round basis. Terteling, and then Triangle, continued to work the mines year round until Stauffer terminated the contract in 1978.

Stauffer notified Triangle of its intent to terminate the agreement on January 15, 1978. The termination became effective on April 1, 1978, the first day of the new mining year. Stauffer acknowledged its liability under section 16(c) of the contract and paid Triangle $1,333,586 in full satisfaction of its obligation.

## II.

### THIS LITIGATION

Triangle filed suit in September 1980, alleging (1) that Stauffer had breached an oral commitment to refrain from exercising the termination clause; (2) that Stauffer acted in bad faith when it terminated the contract; (3) that section 16(b)(2) of the contract, by its express terms, allowed Triangle to recover all of its advance expenditures upon termination; (4) that the change to year-round mining impliedly modified section 16(b)(2) to allow Triangle to recover all of its advance expenditures incurred in anticipation of mining the full 10,000,000 tons of ore; and (5) that Triangle was entitled to recover its advance expenditures in quantum meruit, because Stauffer was unjustly enriched by Triangle's advance work. Triangle sought to recover $1,480,487 as advance expenditures under the last three theories. Triangle moved for partial summary judgment, and Stauffer, in return, also moved for summary judgment.

The district court granted Stauffer's motion for summary judgment. The court concluded that the parties intended their written agreement concerning termination to be integrated, and on this basis, it excluded Triangle's proffered evidence of Stauffer's oral commitments not to terminate in reliance upon the parol evidence rule. Because it also concluded that the contract clearly gave Stauffer the right to terminate, the court disposed of Triangle's claims that Stauffer had breached an oral promise not to terminate and that Stauffer had terminated in bad faith. The court then rejected Stauffer's implied contract and quasi-contract theories on the ground that the parties' express agreement governed the question of Triangle's ability to recover incurred but unrecouped advance expenditures. With regard to section 16(b)(2), the court limited Triangle's recovery to those costs incurred in the year of termination (April 1, 1977 to January 15, 1978) that Triangle could demonstrate were reasonably related to preparations for mining operations in 1978 and that Triangle could have recouped through normal opera-

3. In its entirety, § 16(b)(2) provides:

The parties hereto recognize that the mining operations to be conducted hereunder can be conducted only during seasons of the year in which weather conditions favor such mining operations, and the parties hereto recognize that the successful conduct of such operations during such limited periods of any year requires that funds be expended and that irrevocable commitments to expend funds be made in advance of such limited periods and with respect to operations to be conducted in that year. Accordingly, the parties hereto agree that if one delivers to the other a notice of termination of this agreement pursuant to Section 16(b)(1), it shall pay liquidated damages pursuant to this Section 16(b)(2) to the other party. Such liquidated damages shall be equal to the amount of such funds expended by and the amount of such irrevocable commitments to expend funds made by such other party to the extent they cannot, because of the time of year at which termination of this agreement occurs pursuant to such notice, be recouped by such other party. The obligation of a party hereto to pay the liquidated damages provided in this Section 16(b)(2) shall be independent of, separate from and not in derogation of or satisfaction of any other obligation of such party pursuant to any other provision of this agreement.
Clerk's Record, Docket No. 1, Exhibit 1.

tions during the 1978 mining year. The ultimate effect of this was to reduce Triangle's recovery to $38,646.

Finally, as to the motion in limine which Triangle had requested to exclude a statement it had made in a settlement proposal, the court ruled that the statement constituted the factual basis of Triangle's claim for liquidated damages pursuant to section 16(c) of the contract, not a "negotiation regarding compromise or settlement" subject to exclusion under Fed.R.Evid. 408.

Triangle's appeal addresses four issues. The first is whether, under Idaho law, Stauffer's right to terminate the contract is subject to an implied covenant of reasonableness and good faith. In addition, Triangle asserts that the district court erred in limiting its recovery under section 16(b)(2) of the contract to expenses incurred in the year of termination in anticipation of mining operations during the following year and in rejecting Triangle's implied and quasi-contract theories. Finally, Triangle contends that the district court incorrectly denied its motion in limine.

## III.

### STANDARDS OF REVIEW

■ Let us repeat the appropriate standards of review. Summary judgment is appropriate if, viewing the evidence in the light most favorable to the opposing party, the trial court finds "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); e.g., *Loehr v. Ventura County Community College District*, 743 F.2d 1310, 1313 (9th Cir.1984); *Shatto v. Evans Products Co.*, 728 F.2d 1224, 1225–26 (9th Cir. 1984); *Lojek v. Thomas*, 716 F.2d 675, 677 (9th Cir.1983). We review the district court's decision de novo. *E.g., Lane v. Goren*, 743 F.2d 1337, 1339 (9th Cir.1984); *Nevada v. United States*, 731 F.2d 633, 635 (9th Cir.1984). Moreover, we review the district court's interpretation of state law under the same de novo standard applied to the interpretation of federal law. *Loehr,*

743 F.2d at 1313; *In re McLinn*, 739 F.2d 1395, 1397–1403 (9th Cir.1984) (en banc).

## IV.

### IMPLIED COVENANT OF GOOD FAITH

In support of its assertion of an implied requirement that Stauffer exercise the power of termination reasonably and in good faith, Triangle argues that *every* contract includes an implied obligation of good faith and fair dealing. *See, e.g., Rao v. Rao*, 718 F.2d 219, 222 (7th Cir.1983) (applying Illinois law); *Moore v. Home Insurance Co.*, 601 F.2d 1072, 1074 (9th Cir.1979) (applying Arizona law); *Cleary v. American Air Lines*, 111 Cal.App.3d 443, 453, 168 Cal.Rptr. 722, 728 (1980). Good faith, in turn, "requires that a party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously." *Rao*, 718 F.2d at 223 (quoting *Foster Enterprises v. Germania Federal Savings & Loan Association*, 97 Ill.App.3d 22, 30, 52 Ill.Dec. 303, 309, 421 N.E.2d 1375, 1381 (1981)). This restriction, Triangle contends, applies with equal force to Stauffer's power to end the contract upon ninety days notice. *See, e.g., Randolph v. New England Mutual Life Insurance Co.*, 526 F.2d 1383, 1386 (6th Cir.1975); *deTreville v. Outboard Marine Corp.*, 439 F.2d 1099, 1100 (4th Cir.1971). We disagree.

The Idaho courts have yet to decide whether contracts generally contain an implied obligation to act in good faith or whether good faith or reasonableness conditions an otherwise unrestricted power of termination. *See Scott v. Castle*, 104 Idaho 719, 662 P.2d 1163, 1167 (App.1983). It is true, of course, that a recent Idaho Supreme Court case has imposed a requirement of good faith and reasonableness under quite different circumstances. In *Funk v. Funk*, 102 Idaho 521, 633 P.2d 586 (1981), the supreme court held that a lessor may not arbitrarily withhold his consent under a lease provision requiring the lessor's consent to a proposed sublease.

We do not believe that this case necessarily indicates a willingness to imply an obligation to act in good faith in *all* situations where a contracting party is vested with a discretionary power to terminate. In *Funk,* an arbitrary withholding of consent would have amounted to a restraint or alienation of an interest in property, which has not been favored by the law for centuries. Thus, the Idaho Supreme Court said, "The imposition of a reasonableness standard also gives greater credence to the doctrine that restraints on alienation of leased property are looked upon with disfavor and are strictly construed against the lessor." 102 Idaho at 524, 633 P.2d at 589. Clearly such a construction supports the intention of the parties. Enforcing the termination provision according to its terms would do so in the present case.

■ We are satisfied that Idaho courts tie obligations of good faith closely to the intent of the parties as implied from the facts of each particular case. Thus, it has been observed "that a contract includes not only what is stated expressly but also that which *of necessity* is implied from its language." *Commercial Insurance Co. v. Hartwell Excavating Co.,* 89 Idaho 531, 407 P.2d 312, 317 (1965) (emphasis added), *quoted in Scott v. Castle,* 104 Idaho 719, 662 P.2d 1163, 1167 (App.1983); *accord Pern v. Stocks,* 93 Idaho 866, 477 P.2d 108, 111 (1970). Although the Idaho cases do little to flesh out this language, the apparent hesitancy to imply contract terms accords with precedents in other jurisdictions suggesting that courts will imply terms *only* where necessary to effectuate the parties apparent intent. *See, e.g., Walgreen Arizona Drug Co. v. Plaza Center Corp.,* 132 Ariz. 512, 647 P.2d 643, 646 (App.1982); *Higginbottom v. Thiele Kaolin Co.,* 251 Ga. 148, 304 S.E.2d 365, 366 (1983); *Brown v. Safeway Stores,* 94

Wash.2d 359, 617 P.2d 704, 711 (1980); *see also Morin Building Products Co. v. Baystone Construction, Inc.,* 717 F.2d 413, 415 (7th Cir.1983) ("The requirement of reasonableness is read into a contract not to protect the weaker party but to approximate what the parties would have expressly provided with respect to a contingency that they did not foresee, if they had foreseen it.").

■ In the present case, the contract is unambiguous: It expressly provides that the agreement is terminable at will by either party on ninety days notice. This alone suggests the termination provision should be enforced according to its terms. *See, e.g., S & F Corp. v. American Express Co.,* 60 Ill.App.3d 824, 17 Ill.Dec. 883, 887, 377 N.E.2d 73, 77 (1978); *Exxon Corp. v. Atlantic Richfield Co.,* 678 S.W.2d 944 (Tex.1984). Moreover, strictly enforcing the termination provision in this case effectuates the intentions of the parties. After a long period of negotiation, Stauffer and Terteling inserted the ninety-day termination provision to secure tax benefits for both companies.[4] They intended to give each other unrestricted discretion to terminate the arrangement upon ninety days notice. We believe that an Idaho court would honor this intention and would not override it by implying a good faith limitation.

We readily acknowledge, as we must, that many courts have implied a covenant of good faith to limit the exercise of an express, unambiguous discretionary power of termination. For example, in *Busam Motor Sales v. Ford Motor Co.,* 85 F.Supp. 790, 796 (S.D.Ohio 1949), *appeal dismissed,* 185 F.2d 531 (6th Cir.1950), the court, applying Michigan law, concluded that an automobile manufacturer had to act in

4. The parties sought a private letter ruling according Stauffer an economic interest in the property subject to the depletion allowance associated with the phosphate leases and providing Terteling capital gains treatment on the sale. *See* Clerk's Record, Docket No. 77, Exhibits 17–21. The parties initially contemplated a one-year termination provision, *id.* Exhibit 18, but this proved unacceptable to the IRS. Consequently, Terteling's house counsel advised inserting a 90-day provision, *id.* Exhibit 19, and Terteling granted its counsel a power of attorney to make the change, *id.* Exhibit 20. The IRS rendered the desired ruling. *Id.* Exhibit 21. An implied obligation of good faith might have caused the IRS to withhold its ruling.

good faith in terminating an automobile dealership contract that, by its terms, was terminable at will by either party. In *de-Treville v. Outboard Marine Corp.*, 439 F.2d 1099 (4th Cir.1971), the court concluded that an unrestricted termination clause did not offer a complete defense to a franchise dealer's suit for wrongful termination of the franchise agreement: "[R]egardless of broad unilateral termination powers, the party who terminates a contract commits an actionable wrong [under South Carolina law] if the manner of termination is contrary to equity and good conscience." *Id.* at 1100. And in *Randolph v. New England Mutual Life Insurance Co.*, 526 F.2d 1383 (6th Cir.1975), the court concluded that under Ohio law an insurance company could not terminate a general agency contract with one of its agents in bad faith.

Moreover, we acknowledge, as again we must, that many of the courts implying a good faith obligation where a contract contains an unrestricted right of termination have asserted that such a covenant exists in *every* contract. *See, e.g., Rao v. Rao,* 718 F.2d 219, 222 (7th Cir.1983). The statement is much too broad. Courts have implied a covenant of good faith to override express contractual provisions only in certain special circumstances. These arise "mainly ... in contractual relations which involve a special element of reliance such as that found in partnership, insurance, and franchise agreements.... [or] where one party has traditionally held vastly superior bargaining power—the termination of a salesperson's 'at will' employment contract." *Aluevich v. Harrah's,* 660 P.2d 986, 987 (Nev.1983); *see United Roasters, Inc. v. Colgate-Palmolive Co.,* 649 F.2d 985, 989 (4th Cir.) ("Perhaps the application [of the good faith principle] should vary with the context. When termination is oppressive, when it would frustrate expectations reasonably held, though unsecured by express contractual agreements and when it will impose substantial losses upon the other party, application of the

principle may well be called for; in other contexts, an exercise of an unqualified right of termination should best be left to a determination of his own best interest by the party possessing the right."), *cert. denied,* 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981). More specifically, courts have implied a covenant of good faith in situations involving the termination of employment contracts, *see, e.g., Rao,* 718 F.2d at 223; *Randolph,* 526 F.2d at 1383; *Shapiro v. Wells Fargo Realty Advisors,* 152 Cal.App.3d 467, 199 Cal.Rptr. 613 (1984); *Cleary v. American Airlines,* 111 Cal.App.3d 443, 168 Cal.Rptr. 722 (1980), insurance contracts; *see, e.g., Spindle v. Travelers Insurance Cos.,* 66 Cal.App.3d 951, 136 Cal.Rptr. 404 (1977), and—sometimes—franchise or dealership arrangements, *compare deTreville,* 439 F.2d at 1100 (allowing action for bad faith termination) *with Corenswet, Inc. v. Amana Refrigeration, Inc.,* 594 F.2d 129, 136–39 (5th Cir.) (upheld arbitrary termination by manufacturer of distributorship agreement providing for termination "at any time for any reason" upon 10 days notice), *cert. denied,* 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979). Where there exists no special element of reliance or unequal bargaining power, however, courts generally conclude that "[w]hen the right to terminate a contract is absolute under the clear wording in the agreement the motive of the party in terminating such an agreement is irrelevant to the question of whether the termination is effective." *Augusta Medical Complex, Inc. v. Blue Cross,* 227 Kan. 469, 608 P.2d 890, 896 (1980); *accord Smith v. Price's Creameries,* 98 N.M. 541, 650 P.2d 825, 830 (1982) ("Where a contract provides for a manner by which termination can be effected, those provisions must ordinarily be enforced as written .... [Plaintiff's] argument as to whether [defendant's] action in terminating the contract was done in good faith is not material to the issues herein.").[5]

---

**5.** Cases analyzing the applicability of the good faith requirement of the U.C.C. to termination provisions in contracts concerning the sale of

goods illustrate this point. In *Cardinal Stone Co. v. Rival Mfg. Co.,* 669 F.2d 395 (6th Cir.1982) (per curiam) and *Corenswet, Inc. v. Amana Re-*

Here, the special elements of reliance and unequal bargaining power are absent. The Tertelings are sophisticated and experienced businessmen quite capable of holding their own with Stauffer. They negotiated over the termination provision for more than a year. It was inserted at *Terteling*'s behest to secure favorable tax treatment for both parties. *See supra* p. 192 n. 4. Under these circumstances, we believe that the Idaho courts would not impose a good faith limitation on Stauffer's otherwise unrestricted power of termination. *See Aluevich v. Harrah's,* 660 P.2d 986, 987 (Nev.1983); *see also Niagara Mohawk Power Corp. v. Graver Tank & Manufacturing Co.,* 470 F.Supp. 1308 (N.D.N.Y.1979) (granting preliminary injunction because owner of nuclear power plant demonstrated probable success on the merits of its claim under New York law for specific performance of owner's right to terminate unilaterally a construction contract). We therefore conclude that the district court correctly rejected Triangle's claim that Stauffer terminated the contract in bad faith.

## V.

### RECOVERY UNDER SECTION 16(b)(2) OF THE CONTRACT

█ Triangle next asserts that the district court erred in limiting Triangle's recovery under section 16(b)(2) of the contract. Section 16(b)(2) expresses the parties' recognition that Triangle would operate the mines on a seasonal basis each year and that such a limited operation would entail expenditures "in advance of such limited [mining] periods and with respect to operations to be conducted in that year." *See supra* p. 189 n. 3. The parties appar-

ently intended this provision to guard against the risk that termination would occur *after* the expenditure of funds in anticipation of the mining season but *before* the mining actually began or, at least, before Triangle could recoup its expenditures through mining operations in the year of termination. Accordingly, the trial court limited Triangle's recovery to funds expended during the contract year of termination (April 1, 1977 to January 15, 1978, the date of termination) that would have been recoverable during the following contract year (April 1, 1978 to March 31, 1979).

Triangle challenges this interpretation, asserting that section 16(b)(2) requires only that expenditures be made "in advance" of future operations and that the expenditures relate to operations "to be conducted in [the next contract year]." The language of section 16(b)(2) contradicts this position. The section allows recovery of "liquidated damages ... equal to the amount of ... funds expended by and ... irrevocable commitments to expend funds made by such other party to the extent they cannot, *because of the time of the year at which termination of this agreement occurs ...,* be recouped ...." (emphasis added). Therefore, we cannot say that the limitations imposed by the trial court were inappropriate.

Triangle apparently also objects to that portion of the district court's order of August 22, 1983, which restricted recovery to funds Triangle "would have ... recovered in the course of normal mining practices ...." Triangle asserts that the possibility of increasing the rate of ore extraction or changing the location of mining operations makes inapplicable the limitation of the re-

*frigeration, Inc.,* 594 F.2d 129, 136–39 (5th Cir.), *cert. denied,* 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979), courts rejected the argument that the good faith requirement of the U.C.C. limits an otherwise unrestricted right to terminate the contract. Both courts doubted whether public policy frowned upon all contract clauses permitting termination without cause and concluded that the real concern in such cases is economic overreaching, a problem best

addressed by the U.C.C.'s unconscionability provisions. *Accord Mason v. Farmers Ins. Cos.,* 281 N.W.2d 344, 347 (Minn.1979) ("[W]hen a contract states that it may be terminated without cause, then unconscionability, not good faith, is the issue.") Where parties are evenly balanced in terms of sophistication and bargaining power, therefore, the best policy is to enforce unrestricted termination provisions as written. *See* 669 F.2d at 396; 594 F.2d at 136–39.

coverable amount to that which would have been "recovered in the course of normal mining practices." We disagree. The production alternatives available to Triangle were constrained by both the contractual limits on Stauffer's obligation to accept ore and government regulation of mining. Moreover, the district court's reading of the contract is consistent with the remedial tenet of contract law that seeks to place the parties in the position they would have occupied had the contract been performed. That is, the provision, as written, allows for the recovery of liquidated damages equal to the amount of funds expended in the year preceding termination that Triangle could have recovered in the course of normal mining practices during the year following termination.

## VI.

## IMPLIED CONTRACT AND QUASI-CONTRACT

■ Triangle also questions the district court's dismissal of Triangle's implied contract and quasi-contract claims. The district court concluded that an action based on an implied contract or quasi-contract is improper where the parties have entered into an express contract governing the subject matter at issue. *See, e.g., Mediterranean Enterprises v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir.1983); *Rogers v. American President Lines*, 291 F.2d 740, 742 (9th Cir.1961). And although the Idaho Supreme Court has allowed recovery on an implied contract or quasi-contract theory where the underlying express contract is *unenforceable, see McKay Construction Co. v. Ada County Board of County Commissioners*, 96 Idaho 881, 538 P.2d 1185

(1975) (implied contract); *Hixon v. Allphin*, 76 Idaho 327, 281 P.2d 1042 (1955) (quasi-contract), we believe that Idaho courts would not allow such recovery where an enforceable express contract covers the subject. *See Marshall v. Bare*, 107 Idaho 201, 687 P.2d 591, 595 (App.1984) ("Recovery for unjust enrichment cannot be awarded where ... an enforceable express contract cover[s] the same subject matter."); *cf. Peavey v. Pellandini*, 97 Idaho 655, 551 P.2d 610, 612–13 (1976) (upheld admission of reasonable value evidence on quantum meruit theory coupled with an instruction that the jury was not to consider such evidence if it found an express contract); *Continental Forest Products v. Chandler Supply Co.*, 95 Idaho 739, 518 P.2d 1201, 1205 (1974) (allowed recovery on quasi-contract theory after finding that there was no express or implied contract between the parties).[6] The reason for this rule presently is that the remedies for breach of an express contract, whether by law or by express agreement, afford adequate relief. In terms of history, the reason is found in the development of the action of assumpsit in the common law of England.

■ Triangle, to avoid the rule, argues that because of changed circumstances, most notably, the change to year-round mining, section 16(b)(2) no longer covers the relationship between it and Stauffer. The change, Triangle contends, induced it to *increase* its level of advance expenditures. Therefore, Triangle asserts that it can recover both under the express contract and on the basis of either an implied in fact agreement that Stauffer would repay Triangle for "extra" advance work performed because of the change or a quasi-

---

6. *Marshall v. Bare*, 107 Idaho 201, 687 P.2d 591 (App.1984), held only that an express contract precluded an action based on unjust enrichment or quasi-contract. The court did not consider the effect of an express contract on a claim asserting an implied contract. In *Continental Forest Prods. v. Chandler Supply Co.*, 95 Idaho 739, 518 P.2d 1201 (1974), however, the Idaho Supreme Court defined an implied contract as one arising where "there is no express agreement but the conduct of the parties implies an agreement from which an obligation in contract

exists." *Id.*, 518 P.2d at 1205. This suggests that the supreme court would conclude that recovery based on an implied contract theory could not be had where an express contract governed the situation. Certainly, other courts, in assessing the impact of express contracts on lawsuits asserting implied contract and quasi-contract theories, have not distinguished the two theories. *See, e.g., Mediterranean Enterprises v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir.1983); *Rogers v. American President Lines*, 291 F.2d 740, 742 (9th Cir.1961).

contract theory that would deprive Stauffer of its unjust enrichment by reason of the extra preparations made by Triangle. *See Nelson v. Gish*, 103 Idaho 57, 644 P.2d 980, 983 (App.1982) (recovery in quasi-contract allowed for improvements made by the plaintiff to the defendant's property, where the express agreement between the parties was silent on that point). We disagree.

Our rejection of Triangle's argument does not rest on a refusal to accept the fact that Stauffer and Triangle modified their contract to permit year-round operation by Triangle. We assume that such a modification occurred. However, we are convinced that the change should not carry with it the consequences Triangle suggests.

First, the change to year-round mining sharply reduced the risk contemplated by section 16(b)(2). Triangle no longer faced a situation in which it would expend funds in preparing for a limited mining season only to risk having its hopes of recovering those advance expenditures frustrated by Stauffer's decision to terminate. The longer period of operations provided increased opportunities to recover costs. This suggests that the district court might have denied recovery altogether under section 16(b)(2).

Second and much more important, the change to year-round mining did not alter in any fundamental way the parties' risk-allocation with respect to advance expenditures that would take Triangle more than one year to recoup. Working only on a seasonal basis, Triangle still would incur capital expenditures that it could not recoup in only one season.[7] Even then, section 16(b)(2) would provide no help. Although Triangle could recover advance expenditures for the year of termination under section 16(b)(2), that provision provid-

ed no recourse for expenditures planned to be recovered over several seasons.

Whether Triangle operated seasonally or continually, it made its advance expenditures to enhance its position under the contract. It knew of the risk involved; it knew that Stauffer might terminate before it could recoup its costs. Stauffer knew that Triangle knew this. Triangle therefore must be held to the contract. It cannot use implied contract or quasi-contract to escape the terms of the agreement it freely negotiated with Stauffer. *See Industrial Lift Truck Service Corp. v. Mitsubishi International Corp.*, 104 Ill. App.3d 357, 60 Ill.Dec. 100, 103, 432 N.E.2d 999, 1002 (1982).

## VII.

### TRIANGLE'S MOTION IN LIMINE

Triangle objects to the district court's denial of its motion in limine to exclude a portion of Triangle's settlement proposal regarding the section 16(c) penalty.[8] We find it unnecessary, however, to reach the question of whether the district court abused its discretion in denying Triangle's motion. The district court's summary judgment in favor of Stauffer rested on the language of the contract and the circumstances surrounding its formation. There is no indication that the district court gave determinative weight—or indeed, any weight at all—to the challenged statement in Triangle's settlement proposal. We therefore conclude that even if the district court erred in denying Triangle's motion in limine, its error was harmless. *See Reid Brothers Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1307 (9th Cir.), *cert. denied*, —— U.S. ——–——, 104 S.Ct. 279–80, 78 L.Ed.2d 259 (1983); Fed.R.Civ.P. 61; *see also Burgess v. Premier Corp.*, 727 F.2d 826, 833, 836 (9th Cir.1984).

---

7. The parties evidently drafted § 16(c) with this fact in mind. *See supra* p. 189 n. 2 (§ 16(c) contemplates that Triangle "will incur considerable initial expense which it normally would amortize over the term of this Agreement.").

8. The pertinent part of the document states, "it is agreed that Stauffer has the right to terminate as provided under Section 16 of said contract and that proper notice was given. It was mutually agreed to terminate effective April 15, 1978." Clerk's Record, Docket No. 101, at 9.

744

For the foregoing reasons, we affirm the district court's grant of summary judgment for Stauffer. Although we agree with Stauffer's contentions throughout, we do not find that this appeal was frivolous. Accordingly, Stauffer's request for attorney's fees pursuant to Fed.R.App.P. 38 is denied.

AFFIRMED.